PAUL SCHUMACHER AND LINDA AERNI, APPELLANTS AND CROSS-APPELLEES, V. MICHAEL JOHANNS, GOVERNOR OF THE STATE OF NEBRASKA, ET AL., APPELLEES AND CROSS-APPELLANTS, AND FRANK E. LANDIS, JR., IN HIS CAPACITY AS COMMISSIONER (DISTRICT 1, NEBRASKA PUBLIC SERVICE COMMISSION), ET AL., APPELLEES, AND NEBRASKA TELECOMMUNICATIONS ASSOCIATION ET AL., INTERVENORS-APPELLEES AND CROSS-APPELLANTS.

722 N.W.2d 37

Filed September 29, 2006. No. S-05-375.

David A. Domina and Claudia L. Stringfield-Johnson, of Domina Law, P.C., for appellants.

Jon Bruning, Attorney General, and L. Jay Bartel for appellees Michael Johanns et al.

Paul M. Schudel and James A. Overcash, of Woods & Aitken, L.L.P., for appellees Alltel Communications of the Midwest, Inc., et al.

Jack L. Shultz and Gregory D. Barton, of Harding, Shultz & Downs, for appellees Stanton Telecom, Inc., and Three River Telco, and intervenor-appellee Nebraska Telecommunications Association.

Deonne L. Bruning for appellee Cox Nebraska Telecom, L.L.C.

Daniel E. Klaus, Timothy F. Clare, and Mark A. Fahleson, of Rembolt, Ludtke & Berger, L.L.P., for appellee Nebraska Technology and Telecommunications, Inc., and intervenors-appellees Wauneta Telephone Company et al.

Steven G. Seglin, of Crosby Guenzel, L.L.P., for appellee GCC License Corporation.

Eric B. Eisenhart, of Eisenhart Law Office, for appellees Cambridge Telephone Company and Pinpoint Communications, Inc.

Jill Vinjamuri Gettman, of Gettman & Miller, L.L.P., for appellee Qwest Communications International, Inc.

HENDRY, C.J., CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

STEPHAN, J.

Three individuals who subscribe to telecommunications services in the State of Nebraska brought this action against various state officials seeking a declaratory judgment that the Nebraska Telecommunications Universal Service Fund Act (NTUSFA), now codified at Neb. Rev. Stat. §§ 86-316 to 86-329 (Cum. Supp. 2004), is unconstitutional and further seeking an injunction against the continued implementation and enforcement of the NTUSFA. Various entities which provide telecommunications services in Nebraska intervened in opposition. Following a trial on stipulated facts, the district court for Lancaster County upheld the constitutionality of the NTUSFA and denied the declaratory and injunctive relief requested. We affirm.

## BACKGROUND

### PARTIES

Terrell R. Cannon, one of the plaintiffs below, died on August 16, 2006, after submission of this appeal. The remaining appellants, Paul Schumacher and Linda Aerni, have formally notified the court of Cannon's death and stated their intention to proceed with the appeal in their names. Schumacher and Aerni are citizens and residents of Nebraska who subscribe to and receive telecommunications services from various telecommunications service providers in Nebraska. Since July 1, 1999, these telecommunications service providers have included on appellants' telephone bills a surcharge of 6.95 percent of appellants' intrastate telephone service revenues. This surcharge was implemented by the Nebraska Public Service Commission (PSC) pursuant to the NTUSFA. Appellants have remitted the surcharge to these telecommunications service providers as part of their payment of their bills for telecommunications services. Effective October 1, 2005, the PSC apparently reduced the surcharge from 6.95 percent to 5.75 percent of intrastate telephone service revenues.

At the time the action was filed, appellee Michael Johanns was the duly elected and qualified Governor of the State of Nebraska. He has been succeeded in office by current Governor David Heineman. Appellees Frank E. Landis, Jr.; Anne C. Boyle; Lowell C. Johnson; Rod Johnson; and Gerald L. Vap are the duly elected and qualified commissioners of the PSC. Appellee Andy Pollock is the duly appointed and qualified executive director of the PSC.

The remaining appellees are various entities generally engaged in the business of providing telecommunications services in Nebraska, and many of them intervened in this action. Each of these appellees has collected and remitted the NTUSFA surcharge on intrastate telecommunications services revenues. Most of the appellees are eligible to receive financial assistance from the fund created by the surcharge moneys.

### TELECOMMUNICATIONS ACT OF 1996

In 1996, Congress enacted the Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (codified as amended

at scattered sections in title 47 of the U.S. Code). The express purposes of the Telecommunications Act are to "promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies." Pub. L. No. 104-104, 110 Stat. 56 (1996). Prior to the passage of the Telecommunications Act, local telephone service was generally provided by carriers that provided such service as a regulated monopoly. Under the act, these carriers, known as "incumbent local exchange carriers," are, either through negotiated or arbitrated agreements, required to provide interconnection and access to their facilities to requesting telecommunications carriers, known as "competitive local exchange carriers." 47 U.S.C. §§ 251 and 252 (2000). The Telecommunications Act also seeks to foster competition by removing barriers to entry by an entity seeking to provide interstate or intrastate telecommunications service. 47 U.S.C. § 253 (2000).

While seeking to promote competitive markets for the provision of telecommunications services, Congress also sought to preserve the goal of "universal service" as defined in the Telecommunications Act. 47 U.S.C. § 254(c) (2000). Congress directed the Federal Communications Commission (FCC) to establish a federal-state joint board to assist in implementing the universal service principles found in the Telecommunications Act. 47 U.S.C. § 254(a). These principles include the following: (1) "Quality services should be available at just, reasonable, and affordable rates"; (2) "[a]ccess to advanced telecommunications and information services should be provided in all regions of the Nation"; (3) "[c]onsumers in all regions of the Nation, including low-income consumers and those in rural, insular, and high cost areas, should have access to telecommunications and information services . . . that are reasonably comparable to those services provided in urban areas and that are available at rates that are reasonably comparable to rates charged for similar services in urban areas"; (4) "[a]ll providers of telecommunications services should make an equitable and nondiscriminatory contribution to the preservation and advancement of universal service"; and (5) "[t]here should be

specific, predictable and sufficient Federal and State mechanisms to preserve and advance universal service." 47 U.S.C. § 254(b). The Telecommunications Act mandates that "only an eligible telecommunications carrier designated under section 214(e) of this title shall be eligible to receive specific Federal universal service support" and that "[a]ny such support should be explicit . . . ." 47 U.S.C. § 254(e). An "eligible telecommunications carrier" (ETC) should be designated by the "State commission." 47 U.S.C. § 214(e) (2000). "State commission" is defined as "the commission, board, or official (by whatever name designated) which under the laws of any State has regulatory jurisdiction with respect to intrastate operation of carriers." 47 U.S.C. § 153(41) (2000). In Nebraska, that entity is the PSC. See Neb. Const. art. IV, § 20; Neb. Rev. Stat. §§ 86-101 to 86-124, 86-126, and 86-128 to 86-163 (Cum. Supp. 2004). Section 254(f) permits states to "adopt regulations not inconsistent with the [FCC's] rules to preserve and advance universal service." This subsection further provides that "[e]very telecommunications carrier that provides intrastate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, in a manner determined by the State to the preservation and advancement of universal service in that State." *Id.* The FCC has implemented the Telecommunications Act through the adoption of rules, including parts 51 and 54 in title 47 of the Code of Federal Regulations, and the issuance of various orders.

### RELEVANT FCC ORDERS

The primary FCC orders implementing the Telecommunications Act are a trilogy of orders commonly known as the Local Competition Order, the Universal Service Order, and the Access Charge Reform Order. The Universal Service Order is particularly relevant to this case because it establishes rules to implement the universal service provisions of 47 U.S.C. § 254 of the Telecommunications Act. *In the Matter of Federal-State Joint Board on Universal Service*, 12 F.C.C.R. 8776 (Supp. 1997). In this order, the FCC explained that it and state commissions had historically provided for affordable telephone service to all individuals through a combination of implicit and explicit subsidies. These subsidies were designed to benefit persons in "high

cost" areas, primarily rural, where it was expensive for carriers to provide telephone service. *Id.* at 8784. The subsidies also were designed to benefit those with low incomes who otherwise might not be able to afford telephone service. According to the Universal Service Order, "[s]tates traditionally have promoted universal service by, among other things, assuring affordable residential access by explicitly and implicitly subsidizing and pricing basic telephone service at levels associated with very high telephone subscribership rates . . . ." *Id.* at 8783. To accomplish the goal of universal service, "[s]tates have maintained low residential basic service rates through, among other things, a combination of: geographic rate averaging, higher rates for business customers, higher intrastate access rates, higher rates for intrastate toll service, and higher rates for vertical features." *Id.* at 8785. These implicit subsidy mechanisms were designed to "shift costs from rural to urban areas, from residential to business customers, and from local to long distance service." *Id.* at 8784. The Universal Service Order recognized that the system of largely implicit subsidies in existence prior to the enactment of the Telecommunications Act could not be maintained in the competitive environment mandated by the act. The FCC explained that

> [i]mplicit subsidies were sustainable in the monopoly environment because some consumers (such as urban business customers) could be charged rates for local exchange and exchange access service that significantly exceeded the cost of providing service, and the rates paid by those customers would implicitly subsidize service provided by the same carrier to others.

12 F.C.C.R. at 8786-87. "By adoption of the [Telecommunications] Act, Congress has provided for the development of competition in all telephone markets." 12 F.C.C.R. at 8787. According to the Universal Service Order, "[i]n a competitive market, a carrier that attempts to charge rates significantly above cost to a class of customers will lose many of those customers to a competitor." *Id.* Thus, the "pillars of implicit subsidies—high access charges, high prices for business services, and the averaging of rates over broad geographic areas" cannot be maintained in the competitive telecommunications environment mandated by federal law. *Id.*

In the Universal Service Order, the FCC addressed federal universal service support. The FCC explicitly noted that it was not attempting to identify implicit universal service support effected through intrastate rates and would not "attempt to convert such implicit intrastate support into explicit federal universal service support." *Id.* at 8785. Instead, the FCC noted that the "[s]tates, acting pursuant to sections 254(f) and 253 of the [Telec]ommunications Act, must in the first instance be responsible for identifying intrastate implicit universal service support." 12 F.C.C.R. at 8785.

## NTUSFA

In response to the Telecommunications Act, the Nebraska Legislature enacted the NTUSFA. 1997 Neb. Laws, L.B. 686, now codified at §§ 86-316 to 86-329. The purpose of the NTUSFA is to authorize the PSC "to establish a funding mechanism which supplements federal universal service support mechanisms and ensures that all Nebraskans, without regard to their location, have comparable accessibility to telecommunications services at affordable prices." § 86-317. The NTUSFA creates a fund, known as the Nebraska Telecommunications Universal Service Fund (the Fund), that "shall provide the assistance necessary to make universal access to telecommunications services available to all persons in the state consistent with the policies set forth in the [NTUSFA.]" §§ 86-320 and 86-324(1). Under the NTUSFA, telecommunications companies receiving support from the Fund "shall use that support only for the provision, maintenance, and upgrading of facilities and services for which the support is intended." § 86-324(1). "Any such support should be explicit and sufficient to achieve the purpose of the [NTUSFA]." *Id.*

The NTUSFA contains the Legislature's declaration of policy "to preserve and advance universal service" based on the following principles:

> (1) Quality telecommunications and information services should be available at just, reasonable, and affordable rates;
>
> (2) Access to advanced telecommunications and information services should be provided in all regions of the state;

(3) Consumers in all regions of the state, including low-income consumers and those in rural and high-cost areas, should have access to telecommunications and information services, including interexchange services and advanced telecommunications and information services, that are reasonably comparable to those services provided in urban areas and that are available at rates that are reasonably comparable to rates charged for similar services in urban areas;

(4) All providers of telecommunications services should make an equitable and nondiscriminatory contribution to the preservation and advancement of universal service;

(5) There should be specific, predictable, sufficient, and competitively neutral mechanisms to preserve and advance universal service. Funds for the support of high-cost service areas will be available only to the designated eligible telecommunications companies providing service to such areas. Funds for the support of low-income customers, schools, libraries, and providers of health care to rural areas will be available to any entity providing telecommunications services, maintenance, and upgrading of facilities. The distribution of universal service funds should encourage the continued development and maintenance of telecommunications infrastructure;

(6) Elementary and secondary schools, libraries, and providers of health care to rural areas should have access to advanced telecommunications services as described in the Telecommunications Act of 1996. . . .

(7) The implicit support mechanisms in intrastate access rates throughout the state may be replaced while ensuring that local service rates in all areas of the state remain affordable; and

(8) The costs of administration of the . . . Fund should be kept to a minimum.

§ 86-323. The NTUSFA sets forth various powers to be exercised by the PSC, including that the PSC:

(a) Shall have authority and power to subject eligible telecommunications companies to service quality, customer service, and billing regulations. . . .

(b) Shall have authority and power to issue orders carrying out its responsibilities and to review the compliance of any eligible telecommunications company receiving support for continued compliance with any such orders or regulations adopted pursuant to the act;

. . . .

(d) Shall require every telecommunications company to contribute to any universal service mechanism established by the commission pursuant to state law. The commission shall require, as reasonably necessary, an annual audit of any telecommunications company to be performed by a third-party certified public accountant to insure the billing, collection, and remittance of a surcharge for universal service.

§ 86-324(2).

In addition, the NTUSFA provides: "The [PSC] shall determine the standards and procedures reasonably necessary, adopt and promulgate rules and regulations as reasonably required, and enter into such contracts with other agencies or private organizations or entities as may be reasonably necessary to efficiently develop, implement, and operate the fund." § 86-325. The NTUSFA requires the PSC to annually

hold a public hearing to determine the level of the fund necessary to carry out the [NTUSFA]. The [PSC] shall publish notice of the hearing in at least one newspaper of general circulation in the state at least once each week for two consecutive weeks before the hearing. After the hearing, the [PSC] shall determine the amount of the fund for the following year, including a reasonable reserve.

§ 86-328. The NTUSFA also provides that "[i]n the initial year of the fund's operation, the [PSC] shall determine the amount of the fund to be equivalent to the amount which, in the [PSC's] judgment, after careful analysis, is necessary to keep approximately ninety-six percent of Nebraska households subscribed to local telecommunications service." § 86-328.

### PSC IMPLEMENTATION OF NTUSFA

On January 13, 1999, the PSC issued its findings and conclusions concerning access charge reform and universal service

in application No. C-1628, captioned "In the Matter of the Application of the Nebraska Public Service Commission, on its own motion, seeking to conduct an investigation into intrastate access charge reform." In the C-1628 order, the PSC acted to implement the NTUSFA by establishing a transition process during which implicit subsidies contained in intrastate access charges would be removed from the rate structures of ETC's, basic local exchange rates would be adjusted to PSC-approved benchmark rates, and the support of an ETC from the NTUSFA would equal the implicit support removed through revenue reductions created by access charge reductions less additional revenue realized from basic local service rate increases and less any support received from the federal universal service fund that expressly offset intrastate implicit support. Each ETC was required to file a "transition plan" for approval by the PSC in order to implement the directives of the C-1628 order. The rate rebalancing and restructuring effected pursuant to the C-1628 order was to be revenue neutral for the ETC's. The C-1628 order, as modified by a subsequent ruling of the PSC on February 2, 1999, directed that this implicit support be replaced through the funding mechanism created by the NTUSFA by providing for a surcharge on retail end-user revenues from intrastate telecommunications services.

In an order dated June 2, 1999, the PSC, after publishing notice and conducting a hearing, directed all affected telecommunications companies to collect and remit a surcharge of 6.95 percent on retail end-user revenue from intrastate telecommunications services to be deposited in the Fund. The surcharge was to commence July 1. In establishing the amount of the surcharge, the PSC considered several factors, including: (1) proposed and estimated access charge reductions, (2) local rate changes, (3) company earnings, (4) state support for low-income customers, and (5) administrative expenses. Since June 1999, the PSC has annually held a public hearing to determine the surcharge required to meet the funding level necessary to implement the NTUSFA.

On March 20, 2001, the PSC entered a progression order continuing the calculation of NTUSFA support mechanisms under the transitional plan set forth in C-1628. At the time of trial, the PSC was in the process of establishing a long-term universal

service funding mechanism. On April 2, 2002, the PSC approved rules and regulations for the administration of the Fund. These rules and regulations became effective on September 16, 2002, and are codified in the Nebraska Administrative Code as title 291, chapter 10.

### FUND OPERATION

Since July 1, 1999, and the consequent reduction of intrastate access rates charged by ETC's, interexchange carriers as a group have been required by the PSC to flow through to their customers reductions in long distance charges equivalent to such intrastate access charge reductions. Since July 1, 1999, appellants have been users of intrastate long distance services and have accepted the benefits of reductions in long distance service rates.

### JUDGMENT OF DISTRICT COURT

In its order denying declaratory and injunctive relief, the district court concluded that the surcharge imposed under the NTUSFA was not a tax because "it is not a forced contribution intended to raise revenue for the maintenance of government or governmental services offered to the general public," but, rather, is a "regulatory measure" designed to replace revenues lost by telecommunications providers "as a result of the removal of implicit support previously contained in their rates and access charges" with explicit support authorized by the NTUSFA. The district court also rejected appellants' contention that the NTUSFA lacked sufficient standards to guide the PSC in establishing and administering the Fund.

### ASSIGNMENTS OF ERROR

Appellants assign that the district court erred in failing to find the NTUSFA to be unconstitutional and in denying declaratory and injunctive relief. In a cross-appeal, certain appellees assign that the district court erred in not finding (1) that appellants failed to "pursue adequate legal remedies" and (2) that appellants' claims were barred by the doctrines of waiver and/or laches.

### STANDARD OF REVIEW

Whether a statute is constitutional is a question of law; accordingly, the Nebraska Supreme Court is obligated to reach a conclusion independent of the decision reached by the court

below. *Le v. Lautrup*, 271 Neb. 931, 716 N.W.2d 713 (2006); *Ptak v. Swanson*, 271 Neb. 57, 709 N.W.2d 337 (2006).

## ANALYSIS

■ As a preliminary matter, we note that Cannon's death during the pendency of this appeal does not affect our ability to reach the merits. Statutory provisions relative to abatement and revivor of actions apply to cases in the appellate courts. See *Keefe v. Grace*, 142 Neb. 330, 6 N.W.2d 59 (1942). Neb. Rev. Stat. § 25-1403 (Reissue 1995) provides:

> Where there are several plaintiffs or defendants in an action and one of them dies, or his powers as a personal representative cease, if the right of action survive to or against the remaining parties, the action may proceed, the death of the party or the cessation of his powers, being stated on the record.

The rights of action and assignments of error asserted by Schumacher and Aerni are the same as those asserted by Cannon, and therefore survive his death. Pursuant to § 25-1403, Schumacher and Aerni are entitled to a resolution of their appeal.

■ Familiar general principles provide the framework for our analysis. In every constitutional challenge, there attaches the presumption that all acts of the Legislature are constitutional, with all reasonable doubts resolved in favor of constitutionality. *Le, supra*; *Otto v. Hahn*, 209 Neb. 114, 306 N.W.2d 587 (1981). The unconstitutionality of a statute must be clearly demonstrated before a court can declare the statute unconstitutional. *Hamit v. Hamit*, 271 Neb. 659, 715 N.W.2d 512 (2006). Even when a law is constitutionally suspect, a court will attempt to interpret it in a manner such that it is consistent with the constitution. *Dykes v. Scotts Bluff Cty. Ag. Socy.*, 260 Neb. 375, 617 N.W.2d 817 (2000); *Daily v. Board of Ed. of Morrill Cty.*, 256 Neb. 73, 588 N.W.2d 813 (1999).

## IS SURCHARGE A TAX?

Appellants contend that the surcharge imposed by the PSC is an unconstitutional tax. Pursuant to Neb. Const. art. VIII, § 1, only the Legislature has the power to impose taxes. Appellants argue that although the Nebraska Constitution confers some

powers on the PSC in article IV, § 20, the power to tax is not among them. They also contend that the surcharge violates constitutional provisions prohibiting deprivation of property without due process of law. See Neb. Const. art. I, § 3. Appellees argue that the surcharge is not a tax, but, rather, is "an explicit and revenue neutral regulatory charge implemented to replace the implicit support for universal service previously provided by access charges." Brief for appellees at 42.

In *Nebraska P. P. Dist. v. Hershey School Dist.*, 207 Neb. 412, 418, 299 N.W.2d 514, 518 (1980), quoting Black's Law Dictionary (5th ed. 1979), we defined a tax as: " 'An enforced contribution of money or other property, assessed in accordance with some reasonable rule or apportionment by authority of a sovereign state on persons or property within its jurisdiction for the purpose of defraying the public expenses.' " We further stated that the "essential characteristics of a tax are that it is not a voluntary payment but an enforced contribution and, in its essential characteristics, is not a debt." *Nebraska P. P. Dist.*, 207 Neb. at 418, 299 N.W.2d at 518. Although these concepts appear relatively simple, as another court has noted, the "definition of 'tax' in the abstract is a metaphysical exercise." *Brock v. Washington Metropolitan Area Transit Auth.*, 796 F.2d 481, 489 (D.C. Cir. 1986). The term really gains meaning only from the factual and legal context in which the issue comes before the court. See *id.* Thus, to determine whether the surcharge at issue in this case is properly characterized as a tax, it is helpful to examine opinions addressing similar circumstances.

In *Citizens' Utility Ratepayer Bd. v. State Corporation Comm'n*, 264 Kan. 363, 956 P.2d 685 (1998), the Kansas Supreme Court addressed issues arising after Kansas enacted legislation in response to the Telecommunications Act of 1996. The Kansas legislation established a universal service fund and authorized the Kansas Corporation Commission to assess all telecommunications carriers, public utilities, and wireless service providers a surcharge for support of the fund. The act also authorized the providers to collect from their customers an amount equal to the required contributions to the fund. Pursuant to these mandates, the commission required all intrastate telecommunications providers to pay into the fund 14.1 percent of their

intrastate retail revenues. The commission then authorized the providers to pass this assessment through to their customers over a 3-year period, with the highest charge being $3.21 per month.

One provider challenged the assessment, arguing that it was a tax which the commission lacked constitutional authority to impose. The provider argued that the express purpose of the Kansas act was to secure access to telecommunications for the general public, and that thus the revenue raised by the assessment was a tax for the public purpose. The Kansas court disagreed, reasoning that the surcharge was not a tax because it did not raise revenue. The court noted that prior to the passage of the Kansas act, local exchange carriers charged high access rates to all companies which sought to use their services. The rates were higher than the cost of providing services, and the extra money was used to build and maintain land lines. After the passage of the Telecommunications Act of 1996 and pursuant to the Kansas act, local exchange carriers were only allowed to charge access rates which approximated the cost of providing service. To make up for this lost income, the commission imposed the surcharge to fund the universal service fund, from which money was distributed to local exchange carriers for their use in building and maintaining land lines. The Kansas Supreme Court concluded:

> As such, the implicit land line subsidy once found in high access rates is now explicit through the [Kansas Universal Service Fund] surcharge and distribution. All the [fund] surcharge does . . . is manipulate the movement of the same money (extra access rate money) to the same parties (from companies purchasing access to the [local exchange carriers]) to be used for the same reasons (to build and maintain land lines). Thus, the purpose of the [fund] surcharge . . . is not to raise revenue. As such, the surcharge is not a tax.

*Citizens' Utility Ratepayer Bd.*, 264 Kan. at 400, 956 P.2d at 709-10.

Appellants argue that *Citizens' Utility Ratepayer Bd.* is not well reasoned and should not influence our determination of whether the surcharge is a tax. However, the distinction between generating revenue and regulating activity has been utilized by other courts in determining whether an assessment, charge, or

similar measure imposed by an administrative agency constituted a tax. *Rural Telephone Coalition v. F.C.C.*, 838 F.2d 1307 (D.C. Cir. 1988), involved a challenge to certain FCC orders that allocated local exchange costs between interstate and intrastate regulatory jurisdiction. The effect of the orders was to shift certain costs from intrastate to interstate telephone service, with the partial objective of "avoiding large increases in local telephone rates" after the breakup of the monopolistic system and "advancing the goal of universal telephone service." *Id.* at 1310. The FCC orders allocated 25 percent of the local exchange costs to interstate jurisdiction. This allocation transferred those local exchange costs to the rate bases of interstate carriers and forced them to recover those costs through their rates. An interstate carrier challenged the allocation as "an exercise of taxing power that Congress has not delegated to the [FCC]." *Id.* at 1314. Reasoning that a regulation is a tax "only when its primary purpose judged in legal context is raising revenue," the court concluded there was no "reasonable way to construe the . . . cost allocation as having the primary purpose of raising federal revenue." *Id.* The court further concluded that an agency's exercise of a power to allocate costs among state and federal jurisdictions for purposes of ratemaking was not equivalent to an exercise of the power to tax.

In *State of S.C. ex rel. Tindal v. Block*, 717 F.2d 874 (4th Cir. 1983), the court addressed whether the U.S. Secretary of Agriculture impermissibly imposed a tax on milk producers when he exercised his statutory discretion to impose a deduction of 50 cents per hundredweight from the proceeds of the sale of all milk marketed commercially. The deduction was to encourage dairy farmers to reduce milk production and to offset a portion of the cost of a milk price support program. The court reasoned that the "mere fact a statute raises revenue does not imprint upon it the characteristics of a law by which the taxing power is exercised." *Id.* at 887. Instead, the "imposition of assessments have long been held to be a legitimate means of regulating commerce." *Id.* "If regulation is the primary purpose of a statute, revenue raised under the statute will be considered a fee rather than a tax." *Id.* Noting that the clear language and structure of the authorizing statute indicated its primary purpose

was to reduce overproduction of milk, the court concluded that the deduction "bears the indelible imprimatur of the commerce power and is not an unconstitutional exercise of the taxing power." *Id.*

In *State ex rel. Utilities Comm. v. Carolina Utility Cust. Assn.*, 336 N.C. 657, 446 S.E.2d 332 (1994), the North Carolina Supreme Court upheld a statute authorizing a utility commission to create a fund for the expansion of natural gas service to un-served areas. One statutorily mandated source of the fund was refunds payable from interstate pipeline suppliers to local distri-bution companies. The refunds occurred at random times, when-ever rates charged on an interim basis to local distribution com-panies by their interstate pipeline suppliers were later found to be too high by a federal agency; the excess amounts already paid were then required to be refunded. Traditionally, the refunded amounts were passed along to consumers. Pursuant to its statu-tory authority, the commission ordered approximately $5 million in supplier refunds to be deposited into the expansion fund. A cit-izens' group challenged this order, arguing that the capture of the supplier refund constituted a tax and that because the funds were not used for a public purpose, it was an improper exercise of the taxing power under the North Carolina Constitution. The court disagreed, concluding that the capture of the supplier refunds was not a "charge levied upon the general citizenry for the gen-eral maintenance of the government," and thus was not a tax under North Carolina law. 336 N.C. at 683, 446 S.E.2d at 347.

In *Consumers Power v. ABATE*, 205 Mich. App. 571, 518 N.W.2d 514 (1994), a private power company sought permission to impose rate surcharges to recover costs associated with its par-ticipation in an energy assistance program. The surcharges were expressly authorized by statute. A watchdog group contended that the surcharges amounted to a tax on qualifying ratepayers. The court disagreed, finding the surcharges were intended to benefit only the participating utilities and were not intended for the general public. The court reasoned that the surcharges were not a mandatory revenue raiser, as they only became recoverable after the assistance program agreements were voluntarily estab-lished. See, also, *Brock v. Washington Metropolitan Area Transit Auth.*, 796 F.2d 481 (D.C. Cir. 1986) (holding payments into

workers' compensation fund not a tax even though they raised revenue, because primary purpose was regulation).

The NTUSFA includes a provision not found in any of the cases from other jurisdictions involving regulatory surcharges or assessments. Section 86-324(4)(a) permits the State Treasurer to transfer funds from the Fund to the General Fund when cash balances in the General Fund and the Cash Reserve Fund are inadequate to meet current obligations. Such a transfer cannot reduce the Fund balance below that needed to meet its obligations for a 60-day period. § 86-324(4). A transfer must be reversed when sufficient funds are available, but in no event later than June 30, 2007, when the provision of the NTUSFA allowing transfers from the Fund terminates. § 86-324(4)(a) and (d). After 30 days, transfers accrue interest which is credited to the Fund. § 86-324(4)(b). Any transfer which has not been reversed with accrued interest is considered an encumbrance against the General Fund. § 86-324(4)(c). The record does not indicate whether this temporary transfer provision has ever been used.

Notwithstanding this ancillary and temporary provision, we conclude that the primary purpose of the NTUSFA is not to generate revenue for governmental purposes, but, rather, to regulate the telecommunications industry through a rebalancing and restructuring of rates. The funding mechanism established by the NTUSFA enables the replacement of implicit subsidies with explicit subsidies in order to achieve universal service under the new, competitive market environment brought about by the Telecommunications Act. The NTUSFA directs that "[t]he implicit support mechanisms in intrastate access rates throughout the state may be replaced while ensuring that local service rates in all areas of the state remain affordable[.]" § 86-323(7). The rate rebalancing and restructuring achieved by the PSC's C-1628 order is intended to be revenue neutral. The surcharge is imposed only on end-user revenues from telecommunications services, and payments from the Fund are made only to eligible telecommunications companies for the sole purpose of "provision, maintenance, and upgrading of facilities and services for which the support is intended." § 86-324(1). Based upon our independent review, we conclude that the surcharge assessed by the PSC pursuant to the NTUSFA is not a tax.

### Does NTUSFA Unconstitutionally Delegate Legislative Authority to PSC?

Appellants contend that the NTUSFA violates the separation of powers provision of article II, § 1, of the Nebraska Constitution, which states:

> The powers of the government of this state are divided into three distinct departments, the legislative, executive and judicial, and no person or collection of persons being one of these departments, shall exercise any power properly belonging to either of the others, except as hereinafter expressly directed or permitted.

Appellants argue that in enacting the NTUSFA, the Legislature improperly delegated legislative power to the PSC, an administrative agency.

It is a fundamental general principle that the Legislature may not delegate legislative power to an administrative or executive authority. *Ponderosa Ridge LLC v. Banner County*, 250 Neb. 944, 554 N.W.2d 151 (1996). The Legislature does, however, have power to authorize an administrative or executive department to make rules and regulations to carry out an expressed legislative purpose, or for the complete operation and enforcement of a law within designated limitations. *Id.* Such authority is administrative in its nature, and its use by administrative officers is essential to the complete exercise of the powers of all departments. *Id.* The limitations of the power granted and the standards by which the granted powers are to be administered must, however, be clearly and definitely stated in the authorizing act. *Id.* Such standards may not rest on indefinite, obscure, or vague generalities, or upon extrinsic evidence not readily available. *Id.* Where the Legislature has provided reasonable limitations and standards for carrying out delegated duties, there is no unconstitutional delegation of legislative authority. *Id.*; *Bamford v. Upper Republican Nat. Resources Dist.*, 245 Neb. 299, 512 N.W.2d 642 (1994). In addressing this issue, we have noted:

> "The question of how far the Legislature should go in filling in the details of the standards which an administrative agency is to apply raises large issues of policy in which the Legislature has a wide discretion, and the court

should be reluctant to interfere with such discretion. Such standards in conferring discretionary power upon an administrative agency must be reasonably adequate, sufficient, and definite for the guidance of the agency in the exercise of the power conferred upon it and must also be sufficient to enable those affected to know their rights and obligations . . . The modern tendency is to be more liberal in permitting grants of discretion to an administrative agency in order to facilitate the administration of laws as the complexity of economic and governmental conditions increases."

*Ponderosa Ridge LLC*, 250 Neb. at 951-52, 554 N.W.2d at 157, quoting *State ex rel. Douglas v. Nebraska Mortgage Finance Fund*, 204 Neb. 445, 283 N.W.2d 12 (1979). Delegation of legislative power is most commonly indicated where the relations to be regulated are highly technical or where regulation requires a course of continuous decision. *Ponderosa Ridge LLC, supra.*

Unlike most administrative agencies, the PSC is a regulatory body created by the Nebraska Constitution. Neb. Const. art. IV, § 20. Its powers are constitutionally defined to include "the regulation of rates, service and general control of common carriers as the Legislature may provide by law. But, in the absence of specific legislation, the commission shall exercise the powers and perform the duties enumerated in this provision." *Id.* PSC authority over telephone rates is rooted in legislative, judicial, and electoral activities during the early 1900's. *State ex rel. Spire v. Northwestern Bell Tel. Co.*, 233 Neb. 262, 445 N.W.2d 284 (1989). Constitutional amendments granted the PSC, formerly known as the Railway Commission, regulatory power over telephone rates which was "previously exercisable only by the Legislature." *State ex rel. Spire*, 233 Neb. at 275, 445 N.W.2d at 293. The PSC is an independent regulatory body under the Nebraska Constitution, and its jurisdiction to regulate common carriers may be restricted by the Legislature only through "specific legislation." See *State ex rel. Spire, supra*, citing Neb. Const. art. IV, § 20. See, also, *Myers v. Blair Tel. Co.*, 194 Neb. 55, 230 N.W.2d 190 (1975) (constitutionally prescribed powers and duties of PSC are plenary and self-executing in absence of any specific legislation on subject.)

The NTUSFA is specific legislation on a subject which the state Constitution generally entrusts to the PSC, namely, the regulation of telecommunications rates and services. It authorizes the PSC to establish a new means of achieving a longstanding goal of universal service by replacing subsidies which had previously been implicit in rates set by the PSC with explicit subsidies administered through the Fund. In their stipulation, the parties characterize the implementation of the NTUSFA by the PSC as "rate rebalancing and restructuring." In determining whether the Legislature included adequate standards to guide the PSC in implementing this new type of rate structure, we cannot ignore the fact that the PSC has powers granted to it by the Nebraska Constitution. We also are guided by the principle that, generally, regulation of telecommunications is a matter within the expertise of the PSC and involves a breadth of judgment and policy determination to which considerable deference is given even by a reviewing court. See, e.g., *In re Application of Neb. Pub. Serv. Comm.*, 260 Neb. 780, 619 N.W.2d 809 (2000).

The issue of whether similar legislation enacted in other jurisdictions provided sufficient standards to authorize an administrative agency to create and administer a universal service fund as a component of telecommunications rate regulation has been considered by at least two other state appellate courts. In *Citizens' Utility Ratepayer Bd. v. State Corporation Comm'n*, 264 Kan. 363, 956 P.2d 685 (1998), the Kansas Supreme Court rejected a contention that the Kansas statute authorizing the Kansas Corporation Commission to administer a universal service fund was an unconstitutional delegation of legislative power to an administrative agency because it did not include sufficient standards to guide the commission in exercising its power. Applying analytical principles very similar to those articulated in Nebraska cases and set forth above, the court concluded that the standards in the Kansas act were sufficiently definite to pass constitutional muster. Specifically, the court noted that the standards identified "which telecommunications rates should be reduced, when they should be reduced, and over what time period they should be reduced." 264 Kan. at 402, 956 P.2d at 711. The standards also identified "which rates may be increased, how much rates may be increased by," "the initial balance of the [Kansas Universal

Service Fund], who must pay into the [fund]," "who qualifies for [fund] distribution, how much distribution an entity should receive, if the [fund] surcharge can be passed along to customers, when and how supplemental funding occurs, and the [fund's] administrator's duties." *Id.* The court noted that these standards were sufficient even though they left "some discretion to the [commission] to determine exactly how a [fund] assessment and payout should occur." *Id.* It noted that due to the complexity of the subject matter and the specialized knowledge of the [commission] in the field of telecommunications regulation, "[t]o require more explicit or definite standards than the Kansas [a]ct provides would severely impede, if not make impossible, the regulation of the telecommunications industry." 264 Kan. at 403, 956 P.2d at 711.

In *Nextel West Corp. v. Indiana Utility Reg.*, 831 N.E.2d 134 (Ind. App. 2005), the Indiana Court of Appeals considered an argument that the Indiana Utility Regulatory Commission lacked statutory authority to establish and administer the Indiana Universal Service Fund. Indiana's statute recognized the maintenance of universal telephone service as a " 'continuing goal' " of the commission and further stated that the public interest required that

> "the [c]ommission be authorized to formulate and adopt rules and policies as will permit the [c]ommission, in the exercise of its expertise, to regulate and control the provision of telephone services to the public in an increasingly competitive environment, giving due regard to the interests of consumers and the public and to the continued availability of universal telephone service."

*Nextel West Corp.*, 831 N.E.2d at 141-42, quoting Ind. Code Ann. § 8-1-2.6-1 (LexisNexis 1998). However, the statute did not specifically authorize the commission to establish the fund. Rejecting a claim that the commission lacked authority to establish the fund, the court concluded that such authority was implicit in the statutory language quoted above and the commission's general purpose to ensure that public utilities provided constant, reliable, and efficient service to the citizens of the state. The court concluded: "We simply cannot believe the legislature would expressly charge the [c]ommission with ensuring the continuing availability of universal service without also conferring

the authority necessary to effectuate that goal." *Nextel West Corp.*, 831 N.E.2d at 143.

The standards for establishment and operation of the Fund under the NTUSFA are somewhat less specific than those of the Kansas statute, but obviously far more so than under the Indiana statute. The stated purpose of the NTUSFA "is to authorize the [PSC] to establish a funding mechanism which supplements federal universal service support mechanisms and ensures that all Nebraskans . . . have comparable accessibility to telecommunications services at affordable prices." § 86-317. In § 86-323, the Legislature stated that it is "the policy of the state to preserve and advance universal service" based on eight principles. The principles generally provide that consumers in all areas of the state should have reasonably priced access to telecommunications services, that all providers of telecommunications services should make an equitable and nondiscriminatory contribution to the preservation of universal service, and that there should be "specific, predictable, sufficient, and competitively neutral mechanisms to preserve and advance universal service." § 86-323(1) through (5). The principles also provide that funds for the support of high-cost areas will be available only to designated ETC's providing service in such areas and that the "distribution of universal service funds should encourage the continued development and maintenance of telecommunications infrastructure." § 86-323(5). The principles state that universal service rules should not preclude the sharing of facilities supported by universal service funds with other local users and that the "implicit support mechanisms in intrastate access rates throughout the state may be replaced while ensuring that local service rates in all areas of the state remain affordable." § 86-323(6) and (7). The principles also articulate that the cost of administrating the Fund should be kept to a minimum. § 86-323(8).

In § 86-324, the Legislature specified that a telecommunications company receiving support from the Fund "shall use that support only for the provision, maintenance, and upgrading of facilities and services for which the support is intended. Any such support should be explicit and sufficient to achieve the purpose of the act." In addition, § 86-324(2)(a) grants to the PSC the authority to subject ETC's to service quality, customer service,

and billing regulations. Section 86-324(2)(b) authorizes the PSC to issue orders carrying out its responsibilities and to review the compliance of ETC's with such orders. Section 86-324(2)(c) allows the PSC to withhold all or a portion of the funds to be distributed for failure to comply with orders or regulations. Section 86-324(2)(d) authorizes the PSC to "require every telecommunications company to contribute to any universal service mechanism established by the [PSC] pursuant to state law." It further requires the PSC to obtain an annual audit of any telecommunications company to ensure the billing, collection, and remittance of "a surcharge for universal service." § 86-324(2)(d). Section 86-324(2)(e) requires the PSC to obtain an audit of information provided by a telecommunications company for purposes of calculating universal service fund payments to the company. Section 86-324(2)(f) allows the PSC to fine any person who violates the NTUSFA.

Section 86-325 grants to the PSC the authority to "determine the standards and procedures reasonably necessary, adopt and promulgate rules and regulations as reasonably required, and enter into such contracts with other agencies or private organizations or entities as may be reasonably necessary to efficiently develop, implement, and operate the [F]und." Pursuant to § 86-328, the PSC is required to hold an annual public hearing to determine the level of the Fund necessary to carry out the NTUSFA and a reasonable reserve, and is required to publish notice of such hearing at least once each week for 2 consecutive weeks prior thereto. Section 86-328 also provides that in the initial year of the Fund's operation, the PSC "shall determine the amount of the [F]und to be equivalent to the amount which, in the [PSC's] judgment, after careful analysis, is necessary to keep approximately ninety-six percent of Nebraska households subscribed to local telecommunications service."

We conclude that these provisions of the NTUSFA constitute reasonably adequate, sufficient, and definite standards for the guidance of the agency in the exercise of the power conferred upon it, and to enable those affected to know and understand their rights and obligations. See *Ponderosa Ridge LLC v. Banner County*, 250 Neb. 944, 554 N.W.2d 151 (1996). Regulation of the telecommunications industry is a complex field as to which the

PSC has special expertise and constitutional authority. The fact that the standards set forth in the NTUSFA permit the exercise of discretion by the PSC in its implementation reflects this reality. To require more explicit and definite standards could impede or prevent effective regulation. See *Citizens' Utility Ratepayer Bd. v. State Corporation Comm'n*, 264 Kan. 363, 956 P.2d 685 (1998). The NTUSFA is not an unconstitutional delegation of legislative authority to the PSC.

### OTHER CONSTITUTIONAL CLAIMS

Appellants argue that the NTUSFA violates their due process and equal protection rights. This argument is based on the premise that the surcharge constitutes an unlawful tax, which we have rejected. We conclude that the NTUSFA does not violate appellants' state or federal rights to due process or equal protection.

Appellants also argue that the NTUSFA violates article IV, § 20, of the Nebraska Constitution which sets forth the powers and duties of the PSC "in the absence of specific legislation" on a subject. However, as noted above, the NTUSFA is specific legislation on a subject within the regulatory jurisdiction of the PSC, and its enactment does not in any way violate article IV, § 20.

### CONCLUSION

Based upon our independent review, we find no merit in any of appellants' claims that the NTUSFA violates the federal or Nebraska Constitution. We therefore do not address the issues raised in the cross-appeal and affirm the judgment of the district court.

AFFIRMED.

WRIGHT, J., participating on briefs.