reasons for arrest that must be included in a sworn report are those facts supporting the officer's suspicion that the individual arrested drove or physically controlled a motor vehicle while under the influence of alcohol or drugs. Hoppens does not dispute that Shymkewicz' sworn report included these factual reasons or argue that the sworn report was otherwise deficient. Accordingly, we affirm the judgment of the district court.

We note that in *Sherman v. Neth*,[24] the Court of Appeals held that a sworn report must contain sufficient assertions to allow an inference that the motorist was on a public road or private property open to public access. Although we reversed the Court of Appeals' decision on other grounds in *Sherman v. Neth*[25] and remanded the cause to the Court of Appeals with orders to vacate its decision, we take this opportunity to disapprove the above-stated holding in the Court of Appeals' decision.

Affirmed.

Heavican, C.J., participating on briefs.

---

[24] *Sherman v. Neth*, 19 Neb. App. 435, 808 N.W.2d 365 (2011).

[25] *Sherman v. Neth*, 283 Neb. 895, 813 N.W.2d 501 (2012).

---

Telrite Corporation, doing business as Life Wireless, appellant, v. Nebraska Public Service Commission, appellee.

___ N.W.2d ___

Filed August 22, 2014.    No. S-13-870.

1. **Public Service Commission: Appeal and Error.** Under Neb. Rev. Stat. § 75-136(2) (Supp. 2013), an appellate court reviews an order of the Nebraska Public Service Commission de novo on the record.

2. **Appeal and Error.** In a review de novo on the record, an appellate court reappraises the evidence as presented by the record and reaches its own independent conclusions concerning the matters at issue.

3. **Public Service Commission: Appeal and Error.** Under Neb. Rev. Stat. § 75-136 (Supp. 2013), an appellate court must reappraise the evidence on the record as

it relates to the penalty issued by the Nebraska Public Service Commission and reach an independent conclusion.

4. **Appeal and Error.** An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it.

Appeal from the Public Service Commission. Reversed and remanded for further proceedings.

Stephen M. Bruckner, Russell A. Westerhold, and Jacqueline M. DeLuca, of Fraser Stryker, P.C., L.L.O., for appellant.

Jon Bruning, Attorney General, and L. Jay Bartel for appellee.

Wright, Connolly, Stephan, McCormack, Miller-Lerman, and Cassel, JJ.

Connolly, J.

## SUMMARY

Telrite Corporation, doing business as Life Wireless (Telrite), was designated as an eligible telecommunications carrier (ETC) and a Nebraska eligible telecommunications carrier (NETC) by the Nebraska Public Service Commission (PSC). These designations permitted Telrite to participate in the "Lifeline" program and receive subsidies from federal and state funds for the provision of telecommunications service to low-income households. Six weeks after receiving its designations, Telrite held a 1-day outdoor enrollment event in Omaha, Nebraska. At the event, Telrite used the wrong enrollment form, and the PSC later received inquiries and complaints from consumers who had attended.

The PSC issued a show cause order to Telrite and thereafter revoked Telrite's ETC designation and ordered it to cease and desist from offering Lifeline service in Nebraska. Telrite appeals from the PSC order, arguing that the PSC imposed an excessive penalty, exceeded its statutory authority, and failed to comply with its regulations. We agree that the penalty was excessive. Therefore, we reverse the order and remand the cause for further proceedings before the PSC.

## BACKGROUND

### Statutory Background

The Telecommunications Act of 1996 (Telecommunications Act)[1] established the principle of "universal service," which is broadly defined as the goal of "ensuring that all Americans have access to affordable phone service."[2] The Telecommunications Act created the federal Universal Service Fund (Federal Fund) by requiring telecommunications carriers providing interstate services to contribute to "mechanisms established by the [Federal Communications] Commission to preserve and advance universal service."[3] Telecommunications companies participating in universal service programs are eligible to receive support from the Federal Fund if they are designated as an ETC.[4] The Telecommunications Act provides that state commissions are primarily responsible for making ETC designations.[5] In Nebraska, the PSC makes ETC designations.[6]

Among the mechanisms established by the Federal Communications Commission (hereinafter FCC) and supported by the Federal Fund is the Lifeline program, under which qualified low-income consumers pay reduced charges for voice telephone services.[7] ETC's participating in the Lifeline program receive a monthly disbursement of $9.25 from the Federal Fund for each qualified consumer.[8] Lifeline support is limited to a single subscriber per household, and eligibility is determined by the subscriber's income or participation in government programs directly related to income.[9]

---

[1] Pub. L. No. 104-104, 110 Stat. 56 (codified as amended at scattered sections in title 47 of U.S. Code).

[2] *WWC Holding Co. v. Public Service Com'n*, 44 P.3d 714, 717 (Utah 2002).

[3] 47 U.S.C. § 254(d) (2006).

[4] 47 U.S.C. § 254(e).

[5] 47 U.S.C. § 214(e)(2) (2006).

[6] *Schumacher v. Johanns*, 272 Neb. 346, 722 N.W.2d 37 (2006).

[7] 47 C.F.R. §§ 54.101 and 54.401(a)(1) (2013).

[8] 47 C.F.R. § 54.403(a)(1) (2013).

[9] See, 47 C.F.R. § 54.409(a) (2013); 291 Neb. Admin. Code, ch. 10, § 006.04A (2012).

The Telecommunications Act also authorized states to create their own universal service funds and maintain them with mandatory contributions from providers of intrastate telecommunications services.[10] The Nebraska Legislature exercised this power by enacting the Nebraska Telecommunications Universal Service Fund Act (NTUSFA).[11] The NTUSFA created the Nebraska Telecommunications Universal Service Fund (Nebraska Fund) in order to advance the state universal service effort.[12] The Nebraska Fund receives contributions from surcharges collected on all "end-user telecommunications" provided in Nebraska commerce.[13] The NTUSFA also charged the PSC with the creation of the Nebraska Telephone Assistance Program to promote universal service for low-income households and to determine eligibility guidelines and standards for the federal and Nebraska support mechanisms.[14]

In addition to making ETC designations as provided by the Telecommunications Act, the PSC determines the telecommunications providers that are eligible for support from the Nebraska Fund. The PSC denominates a provider eligible to receive support from the Nebraska Fund as a "Nebraska Eligible Telecommunications Carrier" (NETC).[15] The PSC's regulations require ETC's receiving federal support to participate in Nebraska's universal service program,[16] in effect requiring an ETC to receive an NETC designation. An NETC providing services under the Lifeline program is entitled to $3.50 per month for each qualified consumer from the Nebraska Fund.

## Factual and Procedural Background

Telrite is a Georgia corporation with a certificate of authority to do business in Nebraska. Telrite received its first ETC

---

[10] 47 U.S.C. § 254(f).

[11] Neb. Rev. Stat. §§ 86-316 to 86-329 (Reissue 2008).

[12] § 86-324(1).

[13] 291 Neb. Admin. Code, ch. 10, § 002.01 (2012).

[14] § 86-329(1).

[15] 291 Neb. Admin. Code, ch. 10, § 001.01R (2012).

[16] 291 Neb. Admin. Code, ch. 10, § 004.04A (2012).

designation in 2010 and has rapidly become "one of the largest Lifeline ETCs in the country," with designations in approximately half of the states. Telrite often attracts customers by holding outdoor tent events at which it gives qualified applicants a "free" cell phone. If an applicant is qualified for the Lifeline program, the cell phone is activated onsite. In February 2013, Telrite filed an amended application with the PSC seeking designation to participate in the Lifeline program in Nebraska as a prepaid wireless service.

On May 29, 2013, the PSC issued an order designating Telrite as both an ETC and NETC. The order stated that Telrite had committed to comply with all of the Nebraska-specific requirements for ETC's and NETC's, including the requirement to use the form approved by the PSC. The order did not direct Telrite to comply with any specific requirements other than the use of a particular form.

On July 12, 2013, Telrite held its first enrollment event in Nebraska at an outdoor tent in Omaha. Consumer interest was heavy, and the PSC was later notified that applicants had to "wait[] in line for extended periods of time in over ninety (90) degree heat with no shelter or water." As reported by a local media outlet, the police were called to the event when "tempers flared on a hot day." The PSC fielded a number of inquiries from consumers in the days following the event. The questions included: "When was the free phone they received going to be hooked up?"; "When were the tents going to be open again and where?"; "Were there any phones left and could they pick it up at the office?"; "Why was the media coverage not better as to when and where this event was taking place?"; "Why were there only tents in Omaha and not in Lincoln?"; "Why wasn't more information provided in the [PSC's] office about where there are free phones being handed out?"; and "Why was the information about the free phone give away not made more public?" The PSC also received a report that Telrite's representatives had run out of cell phones and told prospective applicants to return on Sunday, July 14, but that when the consumers did so, Telrite representatives were not present. After the PSC contacted Telrite, it voluntarily ceased enrolling additional customers in Nebraska on July 15.

The PSC issued an order on July 30, 2013, demanding that Telrite show cause why its ETC designation should not be revoked or administrative penalties levied against it. The order alleged that Telrite had not contacted the PSC before beginning operations in Nebraska, failed to use the form approved by the PSC, and handed out flyers that failed to state that the PSC made the final eligibility determination. In its answer, Telrite "apologize[d] for the errors made during the launch of its Lifeline service in Nebraska" and "humbly ask[ed] the [PSC] to afford it the opportunity to correct its mistakes." Telrite admitted that it had "failed to implement state-specific customization of [Telrite's] FCC-default standard forms" and control "unruly behavior in the queue." Explaining that turnout had exceeded expectations, Telrite promised to hire security for future events and make water available if the temperature exceeded 85 degrees.

The PSC held a hearing on the show cause order on August 27, 2013. Telrite's counsel began by stating that the PSC had the power to order "revocation, fine, some other remedy, whatever you deem appropriate," but that its decision should be "guided by . . . the public interest." Brian Lisle, Telrite's president, admitted that Telrite had used the form applicable in states where the FCC is responsible for ETC designations instead of the form approved by the PSC. Lisle testified that he had sent an e-mail to Telrite's compliance department about the Nebraska-specific requirements, but that there had been "a lack of follow-up on communication there." Lisle testified that the independent contractor who administered the Omaha event had received "FCC training" but not "[Nebraska Telephone Assistance Program] training."

Lisle also testified about the status of persons who had received cell phones at the Omaha event and Telrite's plan to "re-enroll" those individuals. Lisle stated that about 944 people had applied at the event and that Telrite approved 796 of the applications onsite. Unless they had contacted Telrite to cancel, the approved applicants were receiving service as of the hearing. Telrite, however, had not received any disbursements from either the Federal Fund or Nebraska Fund. Lisle testified that Telrite intended to contact its Nebraska

customers and ask them to complete and return the Nebraska application. Lisle promised that, in the future, Telrite would use "employee teams" in Nebraska and abstain from giving away free cell phones onsite. Instead, Telrite would take applications and later mail cell phones to the applicants approved by the PSC.

One of the concerns expressed by commissioners was the potential for households receiving multiple Lifeline subsidies. One commissioner noted that the FCC was trying to combat a "run on the fund" by ineligible persons and had removed "millions of people" from the Lifeline rolls, which suggested to the PSC that "there is a lot of waste and a lot of abuse there." At the Omaha event, Telrite's representatives validated applicants' information onsite by comparing the information given by applicants to a database of current Lifeline enrollees. Lisle testified about Telrite's enrollment process, including the steps intended to flag "duplicate[s]." Lisle admitted that Telrite's representatives at the Omaha event did not have access to the database of Nebraska enrollees maintained by the PSC.

Telrite cited statistics suggesting that low-income Nebraskans are underserved by Lifeline providers. Telrite's counsel stated that the "penetration rate"—the percentage of eligible households that are enrolled in the Lifeline program—is 40 percent nationally but only 6 percent in Nebraska. He further stated that several of Nebraska's neighboring states were outperforming it, noting that the penetration rate was 42 percent in Kansas, 29 percent in Missouri, and 28 percent in Iowa.

On September 17, 2013, the PSC entered an order revoking Telrite's ETC designation and directing Telrite to cease and desist from offering services as a Lifeline provider in Nebraska. In its order, the PSC identified three main areas of concern that supported its decision. First, Telrite had failed to comply with Nebraska Telephone Assistance Program requirements a mere 6 weeks after it had promised to do so during the application process. Second, Telrite had substantial experience with the Lifeline program and was therefore less deserving of leniency. The third factor identified by the PSC was a lack of oversight. The PSC found Telrite's failures "even more

disturbing" given the heightened scrutiny that the Lifeline program had borne in recent years. The order generally referred to violations of the PSC's "rules, regulations and orders" but did not identify any specific rules, regulations, or orders that Telrite had violated.

## ASSIGNMENTS OF ERROR

Telrite assigns, restated and reordered, that the PSC erred by (1) ordering an excessive penalty; (2) determining that it possessed the authority to revoke an ETC designation; (3) concluding that Telrite had violated the PSC's rules and regulations; and (4) failing to follow its rules and regulations governing ETC's and NETC's.

## STANDARD OF REVIEW

[1,2] Under Neb. Rev. Stat. § 75-136(2) (Supp. 2013), an appellate court reviews an order of the PSC de novo on the record. In a review de novo on the record, an appellate court reappraises the evidence as presented by the record and reaches its own independent conclusions concerning the matters at issue.[17]

## ANALYSIS

### Excessive Penalty

Telrite argues that the penalty meted out by the PSC in its order—revocation of Telrite's ETC designation and an order to cease and desist from providing Lifeline services—was excessive. Telrite emphasizes that it accepted responsibility for its mistakes, has a "rigorous application and review process," and proposed corrective measures.[18] Furthermore, Telrite notes that the underlying violation "amount[ed] to little more than *using the wrong form*."[19] The PSC argues that Telrite has understated the significance of its conduct, especially in light of the concern for fraud in the Lifeline program,

---

[17] *In re Margaret Mastny Revocable Trust*, 281 Neb. 188, 794 N.W.2d 700 (2011).

[18] Brief for appellant at 22.

[19] *Id*. at 11 (emphasis in original).

and that the Omaha event occurred a mere 6 weeks after Telrite received its designations. Although we do not express an opinion whether lesser penalties are justified, we agree with Telrite that revocation and a cease-and-desist order were not warranted on the facts before us.

[3] As an initial matter, the parties disagree whether we should defer to the PSC's penalty determination. Telrite asserts that, because § 75-136 authorizes de novo review, we do not owe any deference to the PSC's determination. The PSC maintains that our previous decisions require us to affirm the sanction ordered by the PSC absent "'arbitrar[iness] or an 'abuse of discretion.'"[20] In those cases, we stated that determinations by the PSC are a matter peculiarly within its expertise and involve a breadth of judgment and policy determination that an appellate court should not disturb in the absence of a showing that the PSC's action was arbitrary or unreasonable.[21] But we made these statements before 2013, when the Legislature amended § 75-136 to provide a "de novo on the record" standard of review.[22] Before 2013, a party appealed from the PSC under the Administrative Procedure Act and an appellate court reviewed the PSC's order for errors appearing on the record.[23] Under this standard of review, our inquiry was limited to whether the decision conformed to the law, was supported by competent evidence, and was neither arbitrary, capricious, nor unreasonable.[24] Our review of pre-2013 cases shows that the deference accorded to the PSC was tied to the deferential standard of review applied by an appellate court under the Administrative Procedure Act. We therefore reject the PSC's contention that it is due the same degree of deference

---

[20] Brief for appellee at 32, citing *In re Proposed Amend. to Title 291*, 264 Neb. 298, 646 N.W.2d 650 (2002).

[21] *In re Claims Against Atlanta Elev., Inc.*, 268 Neb. 598, 685 N.W.2d 477 (2004); *In re Application of Jantzen*, 245 Neb. 81, 511 N.W.2d 504 (1994).

[22] 2013 Neb. Laws, L.B. 545, § 5.

[23] See, e.g., *Chase 3000, Inc. v. Nebraska Pub. Serv. Comm.*, 273 Neb. 133, 728 N.W.2d 560 (2007).

[24] *Id.*

it enjoyed before the Legislature amended § 75-136. Under the amended § 75-136, an appellate court must reappraise the evidence on the record as it relates to the penalty issued by the PSC and reach an independent conclusion.[25]

Our de novo review of the record leads us to conclude that the revocation and cease-and-desist order was not warranted. In reaching this conclusion, we consider the purposes and goals of the Telecommunications Act and the NTUSFA. In 47 U.S.C. § 254(b), the Telecommunications Act identifies the following "[u]niversal service principles": (1) "Quality services . . . at just, reasonable, and affordable rates"; (2) access to advanced telecommunications to all regions of the United States; (3) telecommunications access to "low-income consumers and those in rural, insular, and high cost areas"; (4) "an equitable and nondiscriminatory contribution to the preservation and advancement of universal service" by telecommunications providers; (5) "specific, predictable and sufficient" federal and state support mechanisms; and (6) the provision of access to advanced telecommunications services for schools, health care providers, and libraries. The NTUSFA similarly includes these "principles" as undergirding the state's policy of preserving and advancing universal service. In addition to these six principles, the NTUSFA includes the principle of keeping the costs of administering the Nebraska Fund to a minimum.[26] But the Legislature has identified the purpose of the NTUSFA as "ensur[ing] that all Nebraskans, without regard to their location, have comparable accessibility to telecommunications services at affordable prices."[27]

The PSC's termination of Telrite's participation as a Lifeline provider in Nebraska does not further the principles of universal service. High among the goals of the federal and state universal service effort is the provision of telecommunications service to low-income households. Lisle testified that about 6 percent of eligible households in Nebraska participate

---

[25] See *In re Margaret Mastny Revocable Trust*, *supra* note 17.

[26] § 86-323.

[27] § 86-317.

in the Lifeline program, compared to 40 percent nationally. Furthermore, while the problems that occurred at the Omaha event were due in part to Telrite's poor planning, they were exacerbated by a larger-than-expected turnout indicative of an unmet demand for Lifeline service in Nebraska. Additionally, the complaints fielded by the PSC in the wake of the Omaha event show that consumers were largely concerned about having greater access to Telrite's offerings. Taken as a whole, the record suggests that there are a substantial number of low-income households in Telrite's intended service area that would benefit from its presence in the marketplace.

Moreover, the PSC's concern for fraud in the Lifeline program does not justify the penalty. During the hearing held on the show cause order, the commissioners noted that the FCC was currently combatting a "run on the fund" by ineligible applicants and had removed "millions of people" from the Lifeline rolls. But there is no indication in the record that Telrite facilitated applications by ineligible persons, and as the PSC admits, Telrite has not received any support from either the Federal Fund or Nebraska Fund for the individuals it approved.

Telrite, using a "pool[ed]" database of current Lifeline subscribers created from the records of 20 to 24 ETC's, rejected more than 15 percent of the applications it received due to ineligibility concerns. Lisle testified that Telrite would continue to run applicants' information through this database before transmitting the application to the PSC as an extra precaution against duplicates. Furthermore, we note that there is substantial overlap between the FCC's eligibility criteria, which were incorporated into the forms used by Telrite, and the PSC's eligibility criteria.[28]

Telrite admitted that it made mistakes, but these initial administrative missteps occurred over the course of a single day and were immediately curtailed. Furthermore, these errors are easily remedied. Telrite submitted to the PSC a proposed

---

[28] Compare 47 C.F.R. § 54.409(a) with 291 Neb. Admin. Code, ch. 10, § 006.04A.

process to "re-enroll" its Nebraska subscribers using the correct form and flyers to be handed out at future events stating that the PSC would make the final eligibility determination. The PSC did not object to either of these proposals.

We need not express an opinion regarding the appropriateness of lesser sanctions. The NTUSFA provides that the PSC has the power to withhold funds if a telecommunications company fails to comply with the PSC's orders or regulations and, under Neb. Rev. Stat. § 75-156 (Supp. 2013), administratively fine any person who violates the NTUSFA.[29] We note in passing that noncompliance with the PSC's orders violates the NTUSFA[30] and may subject a telecommunications provider to fines under § 75-156. But the only order in the record that Telrite violated was the May 29, 2013, order, which stated that Telrite must use a Nebraska-specific form. Under § 75-156(1), the PSC has the discretion to issue fines of up to $10,000 per day if it finds, by clear and convincing evidence, that "any term, condition, or limitation of any certificate, permit, or authority issued by the [PSC]" or "any rule, regulation, or order of the [PSC]" was violated. Should the PSC consider the imposition of an administrative fine on remand, § 75-156(5) directs it to consider the gravity of Telrite's violation and its good faith efforts to achieve compliance after being notified of the violation. And, of course, Telrite's conduct at the Omaha event may be considered should future compliance problems occur.

## Remaining Assignments
### of Error

[4] Because we conclude that the penalty ordered by the PSC was excessive, we do not reach Telrite's remaining assignments of error. An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it.[31]

---

[29] § 86-324(2)(c) and (f).

[30] See § 86-324(2)(b).

[31] *Lang v. Howard County*, 287 Neb. 66, 840 N.W.2d 876 (2013).

## CONCLUSION

From our de novo review of the record, we conclude that the revocation and cease-and-desist order imposed by the PSC was excessive. We do not make light of Telrite's failure to use the correct form a mere 6 weeks after the PSC ordered it to do so. Nor do we express an opinion whether lesser sanctions are justified. But, considering the low participation rate of Nebraska households in the Lifeline program and the purposes of both the Telecommunications Act and the NTUSFA, revocation and a cease-and-desist order were not warranted by Telrite's failure to use the correct form during a 1-day event. Accordingly, we reverse, and remand to the PSC for further proceedings.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.

HEAVICAN, C.J., participating on briefs.