2006 WY 55

WYOMING DOWNS RODEO EVENTS, LLC, a Nevada limited liability company; and Wyoming Horseracing, Inc., a Wyoming corporation, Appellants (Plaintiffs),

v.

STATE of Wyoming; and Jon R. Forwood, District Attorney, First Judicial District, State of Wyoming, Appellees (Defendants).

No. 05–201.

Supreme Court of Wyoming.

May 4, 2006.

Representing Appellants: Bruce A. Salzburg of Freudenthal, Salzburg & Bonds, P.C., Cheyenne, Wyoming.

Representing Appellees: Patrick J. Crank, Wyoming Attorney General; and Terry L. Armitage, Senior Assistant Attorney General. Argument by Mr. Armitage.

Before HILL, C.J., and GOLDEN, KITE, VOIGT, and BURKE, JJ.

HILL, Chief Justice.

[¶ 1] Appellants, Wyoming Downs Rodeo Events, LLC, and Wyoming Horseracing Inc, (collectively Wyoming Downs) contend that the district court erred in granting summary judgment in favor of Appellee, the State of Wyoming. That judgment had the effect of declaring that Wyoming Downs' Instant Racing terminals were prohibited gambling devices. The judgment also denied Wyoming Downs' request that the District Attorney for the First Judicial District be enjoined from taking any action to prevent Wyoming Downs from operating the Instant Racing terminals at its facilities in Cheyenne. We will affirm.

## ISSUES

[¶ 2] Wyoming Downs raises these issues:

The issue presented in this case is whether Instant Racing, a patented computerized system offering pari-mutuel wagering on horse races run in the past, is lawful in Wyoming. The answer to this question requires the Court's consideration of the following issues:

1. Whether the Wyoming Pari–Mutuel Commission had statutory authority to approve Instant Racing in Wyoming?

2. Whether, following the Wyoming Pari–Mutuel Commission's promulgation of a specific rule to authorize Instant Racing, the Instant Racing terminals are nonetheless illegal "gambling devices" prohibited by Wyo. Stat. Ann. §§ 6–7–101, *et seq.?*

The State articulates the issues in slightly different terms:

I. Whether "Instant Racing" electronic gambling devices are expressly authorized by Wyoming statutes.

II. Whether "Instant Racing" electronic gambling devices are prohibited by Wyoming law.

## FACTS AND PROCEEDINGS

[¶ 3] This case was initiated when Wyoming Downs filed an action for declaratory judgment, seeking the court's declaration that Instant Racing is lawful in Wyoming. Wyoming Downs also sought a preliminary injunction and a permanent injunction against the State of Wyoming, following the issuance of an order by the Cheyenne Police Department that Wyoming Downs cease operation of its Instant Racing terminals in Cheyenne. The district court denied injunctive relief in both instances.

[¶ 4] The following background information, taken from the complaint filed in this case and verified by other materials in the record, is necessary to an understanding of the proceedings at hand:

5. Wyoming Downs is a permittee and operator of the only licensed and permitted horse track in the State of Wyoming in the vicinity of Evanston, Wyoming, pursuant to the authority set out in Wyo. Stat. § 11–25–105(a). Further, pursuant to the authority granted to the Wyoming Pari–Mutuel Commission by Wyo. Stat. § 11–25–102(vii)(A), to permit pari-mutuel wagering on "simulcast" events, Wyoming Downs operates four off-track betting establishments ("OTBs"), located in Evanston, Rock Springs, Cheyenne and Evansville, Wyoming.

6. "Instant Racing" is a patented pari-mutuel wagering system consisting of a number of remote computer terminals connected to a central server located in the State of Maryland. The patent for the "Instant Racing" system is held by Race Tech, LLC, an Arkansas limited liability company. "Instant Racing" is more particularly described as follows:

a. The "Instant Racing" central server contains more than 100,000 races (horse and dog) which have been previously run at various locations around the United States under the authority of the state licensing and regulatory agency of the particular jurisdiction.

b. When money is inserted at a remote terminal (in either $.25 or $1.00 denominations), information regarding an historic race is displayed on the terminal without identification of the location where,

or date on which, it was run. Horses [1] and jockeys, or dogs, are identified only by number, such that it is a statistical impossibility for the wagerer to know the result of the race prior to the placement of his wager. True and accurate past performance information (as published in the "Daily Racing Form" for horse races, or "Rosnet" for dog races, on the date of the race), presented in graphic form, is displayed on the terminal to enable the wagerer to handicap the race prior to placing the wager.

c. Following placement of the wager, the wagerer has the option of viewing the entire race, or viewing only the final furlong of the race, and after the race is shown, the date and location of the race is disclosed to the wagerer.

d. The wagered amount is placed in a pari-mutuel pool of similar denomination wagers, and the first wagerer within the pool to have placed a winning wager wins the pool, less authorized deductions established by the law of the jurisdiction in which the wager was placed. If no wagerer within a particular pari-mutuel pool is successful, the pool is carried over.

e. Wagerers who utilize the handicapping information provided enjoy a significant increase in the odds of placing a winning wager over the odds of winning based upon pure chance.

[¶ 5] Wyoming statutes provide that both "gambling" and "professional gambling" are crimes. Wyo. Stat. Ann. § 6–7–102 (LexisNexis 2005). "Gambling" is defined by Wyo. Stat. Ann. § 6–7–101(a)(iii) (LexisNexis 2005):

(iii) "Gambling" means risking any property for gain contingent in whole or in part upon lot, chance, *the operation of a gambling device* or the happening or outcome of an event, including a sporting event, over which the person taking a risk has no control, but does not include:

(A) Bona fide contests of skill, speed, strength or endurance in which awards are made only to entrants or the owners of entries;

(B) Bona fide business transactions which are valid under the law of contracts;

(C) Other acts or transactions now or hereafter expressly authorized by law;

(D) Raffles or bingo conducted, or pull tabs sold, by charitable or nonprofit organizations where the tickets for the raffle or bingo are sold only in this state and the pull tabs are sold only on the premises owned or occupied by the charitable or nonprofit organization;

(E) Any game, wager or transaction which is incidental to a bona fide social relationship, is participated in by natural persons only, and in which no person is participating, directly or indirectly, in professional gambling; or

(F) Calcutta wagering on contests or events conducted by a bona fide nationally chartered veterans', religious, charitable, educational or fraternal organization or nonprofit local civic or service club organized or incorporated under the laws of this state, provided that:

(I) The contest or event is conducted solely in this state;

(II) Any rules affecting the contest or requirements for participants are clearly posted;

(III) The total prizes or prize money paid out in any one (1) contest or event does not exceed ninety percent (90%) of the total wagers;

(IV) A minimum of ten percent (10%) of the total wagers on each contest or event is donated within one (1) year by the sponsoring organization to a bona fide charitable or benevolent purpose;

(V) No separate organization or professional person is employed to conduct the contest or event or assist therein;

---

1. As a quick aside, we note that Wyo. Stat. Ann. § 11–25–107 (LexisNexis 2005) provides:

Every horse participating in any event authorized by a permit issued under this act shall participate under its true and registered name, shall be fully and truly identified and shall not participate under any other name or identification. There shall be no substitution of horses nor shall any device whatsoever be used to conceal or confuse the name and identification of any horse.

(VI) The sponsoring organization before conducting the contest or event gives thirty (30) days written notice of the time and place thereof to the governing body of the county or municipality in which it intends to conduct the contest or event and the governing body does not pass a resolution objecting thereto;

(VII) The sponsoring organization has complied with the relevant sections of the internal revenue code of 1954, as amended, relating to taxes on wagering.

(G) Display or private use of antique gambling devices in the owner's residence. [Emphasis added.]

"Gambling device" is defined like this: " 'Gambling device' means any device, machine, paraphernalia or equipment except an antique gambling device that is used or usable in the playing phases of any professional gambling activity, whether that activity consists of gambling between persons or gambling by a person involving the playing of a machine[.]' " Wyo. Stat. Ann § 6–7–101(a)(iv) (LexisNexis 2005).

[¶ 6] "Professional gambling" means: "(A) Aiding or inducing another to engage in gambling, with the intent to derive a profit therefrom; or (B) Participating in gambling and having, other than by virtue of skill or luck, a lesser chance of losing or a greater chance of winning than one (1) or more of the other participants[.]" Wyo. Stat. Ann § 6–7–101(viii) (LexisNexis 2005).

[¶ 7] Wyo. Stat. Ann. § 11–25–101 (LexisNexis 2005) creates the Wyoming pari-mutuel commission. As a general rule, the activities which the commission oversees are not "gambling." See Wyo. Stat. Ann § 6–7–101(a)(iii)(C). The commission is required to "make reasonable rules and regulations for the control, supervision and direction of applicants and permittees, including regulations providing for resolving scheduling conflicts and settling disputes between permittees and the supervising, disciplining, suspending, fining and barring from pari-mutuel events of all persons required to be licensed by this act, and for the holding, conducting and operating of all pari-mutuel events conducted pursuant to this act." Wyo. Stat. Ann. § 11–25–104(e) (LexisNexis 2005).

[¶ 8] The definition section for the pari-mutuel statutes, Wyo. Stat. Ann. § 11–25–102 (LexisNexis 2005) provides this information:

(iv) "Event" means a pari-mutuel event;

(v) "Pari-mutuel event" means the events which are authorized by the commission for the conduct of horse racing (to include quarter horse, thoroughbred or other approved races), harness racing, cutter racing, chariot racing, chuckwagon racing, professional roping events and simulcasting of dog racing and the events described in this paragraph as prescribed by the commission;

(vi) "Pari-mutuel wagering" means wagering on the outcome of pari-mutuel events in which those who wager purchase tickets of various denominations on entrants in the events and all wagers for each event are pooled and held by the permittee for distribution, and when the outcome of the event has been decided, the permittee distributes the total wagers comprising the pool, less an amount not greater than twenty-five and nine-tenths percent (25.90%) and less the amount for breakage to holders of tickets on the winning entries;

(vii) "Simulcasting" means the sale of pari-mutuel pools on interstate or intrastate televised pari-mutuel events as prescribed by the commission. The commission shall authorize simulcasting subject to the following conditions:

(A) Simulcasting may be conducted only by a holder of a permit to simulcast issued under this act. The permit shall be authorized annually by the commission for a specified number of days. The commissioners shall issue a simulcast permit only to an applicant authorized under this act to conduct a pari-mutuel event other than simulcasting;

(B) Simulcasting may be conducted off the permitted premises only if the board of county commissioners of the county in which such simulcasting will be conducted grant [grants] its approval;

(C) No simulcasting may be conducted within one hundred (100) miles of any

premises permitted under this act, except that the commission may waive the one hundred (100) mile limitation if the simulcast permit application includes written approval from the permittee whose permitted premises is within the one hundred (100) mile limitation;

[¶ 9] The district court considered the cross motions for summary judgment and heard the arguments of counsel, although the arguments of counsel were not transcribed and not made a part of the record. It is safe to say that there was no disagreement about the "facts" of this case and the district court accepted the facts as set out in Wyoming Downs' complaint, as well as the supporting affidavit. Those facts are recited by the district court in its Order in about the same form as we have set then out in ¶ 4 above. Based on the other materials contained in the record, the district court made these additional findings:

2. . . .

d. Commencing in 2002, the Commission investigated "Instant Racing." Following the investigation, the Commission determined that "Instant Racing" is a form of pari-mutuel wagering; however, it also determined that its regulatory definition of "simulcasting" did not contemplate the display of an historic horse or dog race because the Commission's rules defined the term "simulcast" as the "sale of pari-mutuel pools on interstate or intrastate televised *live* pari-mutuel events." (emphasis added) Rules of the Wyoming Pari–Mutuel Commission, Ch. 1, § xx (2002).

e. On February 7, 2003, the Commission proposed amendments to its Rules including a change in the regulatory definition of "simulcast" to delete the word "live." In the accompanying statement of reasons for the proposed rule change, the Commission stated that the purpose of the change was to "allow the simulcast operator to explore new technologies in parimutuel racing."

f. The proposed rule change was submitted to the office of the Attorney General and Legislative Service Office on April 18, 2003, and following review by the Legislative Service Office, it found that the "rules appear to be within the scope of statutory authority and legislative intent."

g. The rule change was approved by the Governor on May 20, 2003, as within the scope of the statutory authority delegated to the adopting agency, and within the scope of the legislative purpose of the statutory authority granted to the agency. On May 21, 2003, the rules were duly filed with the Secretary of State, State of Wyoming.

h. Following the rule change, on July 11, 2003, at a regular meeting of the Commission, Wyoming Horseracing, Inc., requested permits to operate "Instant Racing" terminals at it OTBs within the State of Wyoming. Following a presentation regarding the system by Race Tech, LLC, the Commission determined that "Instant Racing" is a form of pari-mutuel wagering. On motion made and seconded, the Commission unanimously approved permits for ten "Instant Racing" terminals to be operated on a trial basis for ninety days.

i. Following the granting of, and in reliance on, the Commission's permit, Wyoming Horseracing, Inc., purchased and began operat[ing] ten "Instant Racing" terminals at its OTB located in Evanston, Wyoming.

j. On February 6, 2004, following the successful demonstration of the operation of "Instant Racing" terminals previously permitted, Plaintiff, Wyoming Horseracing, Inc., requested the Commission's authorization to operate an additional 70 "Instant Racing" terminals at its OTBs in Wyoming. On motion made and seconded, the Commission unanimously approved permits for an additional 70 "Instant Racing" terminals.

k. Following the granting of, and in reliance on, the Commission's permit, Plaintiff, Wyoming Downs Rodeo Events, LLC, purchased an additional 70 "Instant Racing" terminals, which were installed and operated by Plaintiff, Wyoming Horseracing, Inc., at the OTBs in Evanston, Rock Springs, and Cheyenne, pursuant to a lease agreement between the Plaintiffs.

l. On April 20, and June 7, 2004, the Wyoming Attorney General provided infor-

mal opinions to the Commission, questioning the legality of the "Instant Racing" terminals which the Commission had permitted. As a result of these questions, at its June 14, 2004, regular meeting, the Commission reconsidered its permits. Following the receipt of additional information from Race Tech, LLC, concerning the function and operation of the "Instant Racing" terminals, on motion made and seconded, the Commission continued the permits for the 80 "Instant Racing" terminals. The Commission further determined that the Attorney General would retain the services of an expert to review the function and operation of the "Instant Racing" terminals, and to determine whether the "Instant Racing" terminals "are pari-mutuel according to the Wyoming Statutes on pari-mutuel wagering." [This is referenced in briefs and memos, but I couldn't find this in the record. I don't think it makes any difference because there are no disputes about the facts and this isn't really "material."]

m. On June 28, 2004, Wyoming Horseracing, Inc., was ordered by an officer of the Cheyenne, Wyoming Police Department to cease operating the "Instant Racing" terminals situated in its Cheyenne OTB, and to remove all such terminals on or before noon, July 11, 2004. Plaintiff is informed and believes, and therefore alleges that the order to cease operation and to remove the terminals was given on the advice and direction of Defendant, the Hon. Jon R. Forwood. By subsequent agreement between the parties hereto, the order was amended to require that the terminals be shut down, but not removed, pending the declaration sought in this case.

Plaintiffs contend that, in light of this history, the Instant Racing terminals are "expressly authorized by law" under Wyo. Stat. § 6–7–101(a)(iii)(C), and therefore, their operation does not violate the gambling statute, nor are they prohibited "gambling devices," under Wyo. Stat. § 6–7–101(a)(iv).

Defendants generally contend that in authorizing and permitting the operation of the Instant Racing terminals, the Wyoming State Pari–Mutuel Commission ex-

ceeded the authority granted to it because Instant Racing terminals are not expressly authorized by Wyo. Stat. § 11–25–101, *et. seq.*, and that the Instant Racing terminals constitute prohibited "gambling devices" as defined by Wyo. Stat. § 6–7–101(a)(iv). Defendants further contend that the Instant Racing system is unlawful in light of Wyo. Stat. § 11–25–107, because the identities of the horses are withheld until the wager is placed, and that the system is unlawful because there was no county election specifically approving the system in Laramie County prior to the Commission's permits to operate the system.

The Court concludes that in approving the Instant Racing terminals, the Wyoming State Pari–Mutuel Commission exceeded the authority granted to it by Wyo. Stat. §§ 11–25–101 et seq., and further concludes that the Instant Racing terminals are unlawful "gambling devices" prohibited by Wyo. Stat. § 6–7–101(a)(iv).

[¶ 10] The district court denied Wyoming Downs' motion for summary judgment and granted that offered by the State. By order entered on September 20, 2005, this Court denied Wyoming Downs' motion to stay the district court's order pending this appeal.

## STANDARD OF REVIEW

[¶ 11] When we review a summary judgment, we have before us the same materials as did the district court, and we follow the same standards which applied to the proceedings below. The propriety of granting a motion for summary judgment depends upon the correctness of the dual findings that there is no genuine issue as to any material fact and that the prevailing party is entitled to judgment as a matter of law. A genuine issue of material fact exists when a disputed fact, if proven, would have the effect of establishing or refuting an essential element of an asserted cause of action or defense. We, of course, examine the record from a vantage point most favorable to the party who opposed the motion, affording to that party the benefit of all favorable inferences that fairly may be drawn from the record. Questions of law are reviewed de

novo. *Martin v. Committee for Honesty and Justice at Star Valley Ranch*, 2004 WY 128, ¶ 8, 101 P.3d 123, 127 (Wyo.2004). In this instance, it is the perception of this Court that there are no genuine issues of material fact in dispute, and that the district court has construed the pertinent Wyoming statutes as a matter of law. We review such decisions de novo. See generally, *Fraternal Order of Eagles Sheridan Aerie No. 186, Inc., et al. v. State of Wyoming*, 2006 WY 4, ¶ 16, 126 P.3d 847, 855 (Wyo.2006).

## DISCUSSION

[¶ 12] Our discussion will be brief. Both the briefs and the argument to the Court strayed considerably beyond the materials that are of record and go well beyond the findings and conclusions of the district court. However, we take note from the record that the "Instant Racing" terminals look like and are used like a slot machine or other similar gambling device (e.g., poker machine).[2]

[¶ 13] The patent documents describing the "Instant Racing" terminal (METHODS AND APPARATUS FOR PARI–MUTUEL HISTORICAL GAMING) provide us with these additional clues:

> The present invention is generally related to gaming devices, and more specifically, to a gaming device which enables pari mutuel betting on races such as horse and dog races.
>
> . . . .
>
> . . . [The] racing industry has seen a great increase in competition from lotteries and casinos. At least some patrons prefer a more immediate reward and higher frequency wagering than customarily offered at race tracks. For example, a typical racetrack offers one race every half hour. A casino having slot machines, however, offers a patron the opportunity to place a wager that can be won or lost every few seconds. In order to remain competitive, the racing industry is in need of a gaming

system that satisfies the preferences of many different types of patrons.

It would be preferable, of course, to provide patrons with an opportunity to place wagers on a game which supports the racetrack sport. For example, some racetrack operators offer "simulcasting" which enables patrons to wager on races televised from other sites rather than watching a live race. Simulcasting allows racetrack owners to offer more variety to their patrons in addition to the local live racing, and also facilitates maintaining operations even when the local racing season is over. Although simulcasting does enhance patron loyalty, the number of wagers a patron can place is still limited, particularly in comparison to a slot machine.

Known video and mechanical racing games have fixed odds. Such fixed odds typically are required in order to comply with the applicable regulations of lotteries and casinos. However, for at least some patrons, fixed odds games typically are less enjoyable than pari mutuel wagers. In addition, known racing games normally only simulate a real event, and tend to provide competition with, rather than support for, the actual underlying sport. Also, pari mutuel gambling on racing is allowed in many more jurisdictions than casino games and even lotteries.

It would be desirable to provide a wagering mechanism which incorporates aspects of traditional racetrack wagers, e.g., pari mutuel methods, progressively increasing carryover pool for a large payoff, a more frequent consolation payoff to keep interest from waning, and possibly a series of related pools, yet which also can be played quickly, with a possible instant payoff. It also would be desirable to provide the racing industry with added value or "shelf life", for reruns of live events.

---

**2.** Black's Law Dictionary 611 (5th ed.1979) identifies a "gambling device" like this:

> **Gambling Device.** Such device, apparatus, and the like, as is used and employed for gambling, in the sense that in using it, money or the like is staked, wagered, won, or lost as a

direct result of its employment or operation. A machine, implement, or contrivance of any kind for the playing of an unlawful game of chance or hazard. See **Slot Machine.**

Black's then refers the reader to "gambling device" under its entry for "gaming device." *Id.*

[¶ 14]   Based upon much the same reasoning we employed in the *Fraternal Order of Eagles* case cited above, we conclude that the district court correctly construed and applied the applicable statutes and that it did not err as a matter of law in applying the statutes as it did.  The description of the "Instant Racing" gaming device found in the patent documents makes it unmistakable that it is a "gambling device" as defined by Wyoming law.  Moreover, the description of the gaming device's operation provided in Wyoming Downs' affidavit, as well as the photographs depicting the gaming device which were put into evidence, corroborate the inescapable conclusion that the "Instant Racing" terminals are "gambling devices" that the Wyoming State Pari-mutuel Commission could not authorize via the statutory powers granted to it.   An administrative agency's authority to promulgate rules is circumscribed by the statutes that govern its activities.   Rules promulgated in excess of an agency's authority are null and void.  *McLean v. Hyland Enterprises, Inc.,* 2001 WY 111, ¶ 30, 34 P.3d 1262, 1270 (Wyo.2001).   An agency may not rewrite a statute through its rulemaking power.  *U.S. West Communications, Inc. v. Wyoming Public Service Commission,* 992 P.2d 1092, 1096 (Wyo.1999).

[¶ 15]   In passing, we take note that the term "pari-mutuel" is thoroughly digested at 31 *Words and Phrases,* (1957 and pocket Part 2005), ("pari-mutuel," "pari-mutuel facility," "pari-mutuel machine," "pari-mutuel pools" and "pari-mutuel system"); also see Black's Law Dictionary 1147 (8th ed.2004) ("pari-mutuel betting"), and Webster's Third New International Dictionary, 1642 (1986) ("pari-mutuel").   Of course, in significant part we construe statutes based upon the language used by the legislature and its usual meaning (and in this case perhaps its technical meaning as well).  We are unwilling to embrace a more expansive meaning of pari-mutuel than that which can be discerned from the governing statutes and those sources cited above, which provide us with additional insight as to its usual meaning.  See *Fraternal Order of Eagles,* ¶ 16, P.3d at 855.

[¶ 16]   We also note that the definition of "simulcasting" set out in Wyo. Stat. Ann. § 11–25–102(a)(vii)(C)   (LexisNexis   2005) (providing that simulcasting may not be conducted within one hundred (100) miles of any premises permitted under this act) suggests that pari-mutuel races are generally live events.   Chapter 10 of the Commission's rules and regulations suggests that: (1) A wagerer is to receive a pari-mutuel ticket (and such tickets are not associated with Instant Racing);  (2) that simulcast signals will be encrypted and these apparently are not; (3) and that "simulcast" means the simultaneous telecast of audio and visual signals of running horse races and other permitted pari-mutuel events conducted for the purposes of pari-mutuel wagering.   See 2 Weil's Code of Wyoming Rules, 024 038 010–1–2 (1995).

[¶ 17]   Wyoming Downs contends that this was all clarified by the Legislature in 2005, when it passed legislation that would have clearly authorized the use of Instant Racing in Wyoming.   However, the Governor vetoed that legislation and the Legislature did not succeed in overriding his veto.  2005 Digest Senate and House Journal, H.B. No. 0156 at 278–79.  Wyoming Downs does not cite authority, nor does it make a persuasive argument, that this circumstance would change the meaning or tenor of enacted Wyoming law.  We have found no such authority.  Our conclusion based on simple reason and logic is that such a circumstance has no relevance to our decision today, although it is more likely that it betokens that the law required change to achieve such a result, than that it did not.

[¶ 18]   Wyoming Downs argued that "Instant Racing" terminals are a mere accoutrement of pari-mutuel wagering and that the governing statutes must be construed so as to embrace new "inventions" or "technologies."   We agree with the district court's tacit conclusion that we are not dealing with a new technology here, we are dealing with a slot machine that attempts to mimic traditional pari-mutuel wagering.   Although it may be a good try, we are not so easily beguiled.

## CONCLUSION

[¶ 19]   We affirm the district court's order in all respects.