REQUESTED BY: Senator Beau McCoy
Senator Tony Fulton Nebraska Legislature
You have each requested our opinion regarding the constitutionality of LB 1102. The bill as introduced proposes to amend Neb. Rev. Stat. §2-1203.01 (2007) to authorize the State Racing Commission ["Commission"] to "[l]icense and regulate parimutuel wagering on historic horseraces. . . ." LB 1102, § 1.[1] Neb. Const. art. III, § 24, permits the Legislature to enact "laws providing for the licensing and regulation of wagering on the results of horseraces, wherever run, either within or outside of the state, by the parimutuel method, when such wagering is conducted by licensees within a licensed racetrack enclosure." Your requests regarding the constitutionality of LB 1102 raise the following issues: *Page 2 
 1. Does Neb. Const. art. III, § 24, allow the Legislature to authorize wagering on historic horseraces?
 2. Is the horse race wagering which may be authorized under Neb. Const. art. III, § 24, limited to wagering on live horse races?
 3. Is wagering using an electronic historic horseracing terminal a method of parimutuel wagering on horse races which may be permitted under Neb. Const. art. III, § 24?
 4. Does LB 1102, as introduced, constitute an impermissible delegation of legislative authority?
In addition, Senator Fulton has requested that we address: (1) whether the enactment of LB 1102 will allow Native American tribes to engage in additional gaming on tribal lands involving wagering on historic horseraces; and (2) if passage of the bill will allow Native American tribes to engage in such gaming, whether the state would have the authority to regulate such gaming conducted on tribal lands.
A. Wagering on "Historic Horseraces" Through "Instant RacingTerminals."
While LB 1102 as introduced proposes to authorize the Commission to license and regulate wagering on "historic horseraces," it provides no definition of the term or explanation of the manner in which such wagering would occur. The Introducer's Statement of Intent on LB 1102, however, states the bill "would allow Nebraska licensed horse racing premises the ability to install and operate Instant Racing Terminals."Committee Records on LB 1102, 101st Leg., 2nd Sess., Introducer's Statement of Intent 1 (February 10, 2010).
The wagering on "historic horseraces" which would be authorized under LB 1102 thus appears to refer to the patented wagering system known as "Instant Racing."[2] "Instant Racing" was developed as a joint venture between Amtote International and RaceTech, LLC. The "Instant Racing" system allows bettors to wager on the results of previously run or "historic" races through electronic "Instant Racing Terminals" ["IRTs"]. The machines reportedly can access over 200,000 historic races. Wagers are made by *Page 3 
coin or currency. Players can utilize limited Daily Racing Form past performance data (i.e. winning percentages, average earnings per start, trainer and jockey success, etc.) provided in graphic form before making their selections. The data is provided in such a way that bettors cannot identify the exact race. The machines contain a video screen which allows bettors to view the entire race after placing their wagers, or only a short clip of the stretch run of the race.
Wagering generally is limited to selections involving the order of finish of the first three horses, such as selecting the first three finishers in order, the top two finishers, or the winner and any two of the top three finishers. Variations on such wagering are provided for under the Association of Racing Commissioners International Model Rules for Instant Racing. RaceTech promotes the product as a true parimutuel wagering system. The machines are connected to the same wagering pool and wagers are processed through a central totalisator. Unlike most parimutuel wagering, where many wagers are made on a single race, Instant Racing involves wagers on many different races.[3] Winners receive graduated payoffs based on their correct selection of the order of finish. Payoffs are also determined by timing — the bettor who hits first receives the highest payoff.
In appearance and operation, IRTs resemble slot machines or video lottery devices. The "bells and whistles" associated with slot machines or video lottery devices are all present (except for the pull-handle). The machines are the same height and design as a slot machine, and include flashing buttons, blinking lights, video display, and, in some cases, program numbers spin on the video display like cherries or other figures on a slot or video lottery machine. The machines also can include a "Quick Pick" feature where bettors allow the machine to select at random three numbers to be bet on a race. Pictures of IRTs on the Amtote website illustrate the physical appearance of the machines and their resemblance to slot machines or video lottery devices.
B. Legality of IRTs Under Nebraska Law.
You have asked us to address the constitutionality of the wagering on historic horseraces which would be authorized under LB 1102. This requires consideration of several issues, each of which are addressed below. *Page 4 
1. Does Neb. Const. art. III, § 24, allow the Legislature to authorizewagering on historic horseraces through IRTs?
Art. III, § 24 of the Nebraska Constitution, contains a general prohibition against the Legislature's authorization of "any game of chance or any lottery or gift enterprise when the consideration for a chance to participate involves the payment of money for the purchase of property, services, or a chance or admission ticket or requires an expenditure of substantial effort or time." Neb. Const. art. III, § 24(1). The constitutional provision contains certain exceptions to this general prohibition, one of which allows the Legislature to authorize parimutuel wagering on horse races. Specifically, art. III, § 24(4), provides, in relevant part:
 Nothing in this section shall be construed to prohibit (a) the enactment of laws providing for the licensing and regulation of wagering on the results of horseraces, wherever run, either within or outside of the state, by the parimutuel method, when such wagering is conducted by licensees within a licensed racetrack enclosure. . . .
The Nebraska Constitution was amended in 1934 to allow the Legislature to authorize parimutuel wagering on horseracing. The constitutional amendment was necessitated by Nebraska Supreme Court decisions holding that parimutuel wagering on horse races was a form of "gambling" and a "lottery" or "game of chance" prohibited under the Nebraska Constitution. State ex rel. Sorenson v. Ak-Sar-Ben Exposition Co.,118 Neb. 851, 226 N.W. 705 (1929), permanent injunction entered State exrel. Sorenson v. Ak-Sar-Ben Exposition Co., 121 Neb. 248, 236 N.W. 736
(1931). Following adoption of the constitutional amendment, the Legislature enacted statutes legalizing parimutuel wagering on horse races in 1935. See Comp. Stat. §§ 2-1501 to 2-1519 (Supp. 1935). This legislation is substantially similar to the current statutes governing parimutuel wagering on live racing within licensed racetrack enclosures.Compare Comp. Stat. §§ 2-1504, 2-1505, 2-1507, and 2-1516 (Supp. 1935)with Neb. Rev. Stat. §§ 2-1204, 2-1205, 2-1207, and 2-1216 (2007). The statutes governing parimutuel wagering were amended in 1987 to authorize "intrastate" simulcasting. 1987 Neb. Laws, LB 708 (codified at Neb. Rev. Stat. §§ 2-1224 to 2-1227 (Supp. 1987). Because of uncertainty as to whether the language in art. III, § 24, was sufficient to allow intrastate simulcasting, and recognition that the Constitution could not be construed to permit the Legislature to authorize interstate simulcasting, a constitutional amendment to specifically allow simulcast wagering was proposed in 1988. Committee Records on *Page 5 LR 15CA, 90th Leg., 1st Sess. 37 (March 23, 1987).[4] The legislative history of LR 15CA indicates the amendment was intended to expand parimutuel wagering to allow simulcast wagering on live horseraces run both inside and outside the state, retaining the requirement that the wagering be conducted only within licensed racetrack enclosures.[5] The amendment was approved by a majority of voters at the 1988 general election.
The Nebraska Supreme Court has recognized the following general rules governing the interpretation of constitutional provisions:
 The intent and understanding of [the] framers [of a constitutional provision] and the people who adopted it as expressed in the instrument is the main inquiry in construing it. . . .The words of a constitutional provision will be interpreted and understood in their most natural and obvious meaning unless the subject indicates or the text suggests they are used in a technical sense. The court may not supply any supposed omission, or add words to or take words from the provision as framed. It must be construed as a whole, and no part will be rejected as meaningless or surplusage, if it can be avoided. If the meaning is clear, the court will give to it the meaning that obviously would be accepted and understood by the layman. . . .It is permissible to consider the facts of history in determining the meaning of the language of the Constitution. . . .It is also appropriate and helpful to consider, in connection with the historical background, the evil and mischief attempted to be remedied, the objects sought to be accomplished, and the scope of the remedy its terms imply.
 State ex rel. Spire v. Beermann, 235 Neb. 384, 389-90, 455 N.W.2d 749,752 (1990) (quoting State ex rel. State Railway Comm'n v. Ramsey,151 Neb. 333, 340-41, 37 N.W.2d 502, 508 (1949) (citations omitted)). *Page 6 
The Supreme Court has further recognized that the terms and provisions of the Constitution must be read in a manner which reflects changed circumstances:
 A Constitution is intended to meet and be applied to any conditions and circumstances as they arise in the course of the progress of the community. The terms and provisions are constantly expanded and enlarged by construction to meet the advancing affairs of men. While the powers granted thereby do not change, they do apply in different periods to all things to which they are in their nature applicable.
 State ex rel. State Railway Comm'n v. Ramsey, 235 Neb. at 338,37 N.W.2d at 506.
Art. III, § 24(4), authorizes legislation "providing for the licensing and regulation of wagering on the results of horse races, wherever run, either within or outside of the state, by the parimutuel method, when such wagering is conducted by licensees within a licensed racetrack enclosure. . . ." If wagering on "historic horseraces" by use of IRTs is construed to be "wagering on the results of horse races", is done "by the parimutuel method", and is "conducted by licensees within a licensed racetrack enclosure", it could be argued that it conforms to the language of art. III, § 24(4) and thus may be authorized by the Legislature. Moreover, as this form of wagering no doubt did not exist when the Constitution was amended to authorize parimutuel wagering on horse races in 1934, or in 1988 when simulcast wagering was approved, recognizing the Legislature's power to authorize wagering on "historic horseraces" could be viewed as consistent with the principle that constitutional terms and provisions are "expanded and enlarged by construction to meet the advancing affairs of men." State ex rel. State Railway Comm'n v. Ramsey,235 Neb. at 338, 37 N.W.2d at 506.
The history of the Nebraska constitutional provision allowing the Legislature to permit parimutuel wagering on horse races, however, appears to support only authorizing the enactment of statutes such as those currently in place, providing for parimutuel wagering on live races conducted within Nebraska licensed racetrack enclosures or live races simulcast from other racetracks inside or outside Nebraska to Nebraska racetracks. While it is possible to interpret the literal language permitting the Legislature to authorize "wagering on the results of horseraces, wherever run, either within or outside of the state, by the parimutuel method . . .," to encompass wagering at IRTs, such a construction appears to significantly expand on the intent underlying adoption of this constitutional provision. Originally, parimutuel wagering on horse racing was authorized in 1934 out of recognition of the importance of the livestock and horse breeding industries. Allowing parimutuel wagering on horse races provided a means to support and promote these industries, an important part of the state's agricultural economy. When the Constitution was amended in 1988 to authorize wagering on simulcast race events, it was done so largely to help the racing industry in the face of *Page 7 
competition from other gambling. Simulcast wagering, however, involves only wagering at Nebraska racetracks on live race events conducted either within or outside the State. At no time have Nebraska voters specifically indicated their approval to allow the Legislature to permit wagering on horse races run years ago utilizing electronic machines resembling slot machines or video gaming devices. Indeed, the Constitution refers only to wagering on horse races "wherever" run, not "whenever" run. Therefore, we conclude that a legislative attempt to allow IRTs at licensed Nebraska racetracks, while not clearly unconstitutional, is likely contrary to the limited grant of authority given the Legislature to permit parimutuel wagering on horse races under art. Ill, § 24.[6]
The Nebraska Constitution prohibits all "games of chance," and allows the Legislature to authorize only a state lottery and certain other lotteries, bingo, and parimutuel wagering on the results of horse races. Neb. Const. art. III, § 24. This constitutional provision has been construed to prohibit "casino gambling." State ex rel, Lemon v. Gale,272 Neb. 295, 307, 721 N.W.2d 347, 358 (2006). It is well-established that "[t]he Legislature cannot circumvent an express provision of the Constitution by doing indirectly what it may not do directly." Haman v.Marsh, 237 Neb. 699, 708, 467 N.W.2d 836, 844 (1991). There is no question that the Constitution presently prohibits the Legislature from authorizing "casino gambling" which, of course, includes the use of slot machines or other video or electronic gambling devices. Given the similarity between IRTs and these impermissible gambling devices, a court may find legislation authorizing IRTs as parimutuel wagering on horse races to be an improper attempt to indirectly allow what the Constitution directly forbids.
A recent Wyoming Supreme Court decision supports the conclusion that IRTs are actually impermissible gambling devices, rather than a form of parimutuel wagering on horse races which may be permitted under art. III, § 24. Wyoming Downs Rodeo Events, LLC v. State of Wyoming, 134 P.3d 1223
(Wyo. 2006). The Wyoming Supreme Court stated that IRTs "look and are used like a slot machine or other similar gambling device . . .," and determined that patent documents describing the IRTs, as well as a description of their operation and photographs depicting the devices, "corroborate[d] the *Page 8 
inescapable conclusion" that IRTs were "gambling devices" which could not be authorized by the Wyoming State Pari-Mutuel Commission. Id. at 1229-30. The court noted the devices could not be construed to fall within the authorization for "simulcasting," as the definition of simulcasting "suggest[ed] that pari-mutuel races are generally live events." Id. at 1230, Rejecting the argument that IRTs were "a mere accoutrement of pari-mutuel wagering and that the governing statutes must be construed so as to embrace new `inventions' and `technologies'". . ., the court stated: "[W]e are not dealing with a new technology here, we are dealing with a slot machine that attempts to mimic traditional pari-mutuel wagering. Although it may be a good try, we are not so easily beguiled." Id.
We believe our Supreme Court would also likely conclude that IRTs are impermissible electronic gambling devices within the prohibition against "games of chance" in art. III, § 24(1), and not a form of parimutuel wagering on horse races which may be authorized under art. III, § 24(4). By their nature and operation, IRTs are player-activated instant gaming machines which more closely resemble slot machines than horse races. Unlike wagering on actual horse races, these devices do not allow bettors to know the identity of the horse, jockey, or racetrack; at most, bettors are provided limited "handicapping" information. The wagering involved in the use of IRTs is far removed from conventional wagering on horse races conducted at a racetrack or simulcast live from other racetracks. In our view, the Nebraska Supreme Court, like the Wyoming court, would be inclined to view IRTs as "slot machine[s] that attempt[ ] to mimic traditional pari-mutuel wagering." 134 P.3d at 1230. Accordingly, we conclude that Neb. Const. art. Ill, § 24(4), likely does not permit the Legislature to authorize wagering on historic horseraces through IRTs.
2. Is the horse race wagering which may be authorized under Neb-Const.art. III, § 24, limited to wagering on live horse races?
Parimutuel wagering on horse races in Nebraska is governed by the provisions of Neb. Rev. Stat. §§ 2-1201 to 2-1246 (2007 and Supp. 2009). Enforcement of state laws and rules and regulations governing horse racing is granted to the Commission. Neb. Rev. Stat. § 2-1203.01(1) (2007). Certain entities (the State Board of Agriculture, a county fair board, a county agricultural society, "or a corporation or association of persons organized and carried on for civic purposes or which conducts a livestock exposition for the promotion of the livestock and horse-breeding industries of the state and which does not permit its members to derive personal profit from its activities by way of dividends or otherwise . . ."), may be licensed by the Commission "to conduct horseracing at a designated place within the state." Neb. Rev. Stat. §2-1204 (2007). The license issued by the Commission must designate "the place where the race or race meetings are to be held, and the time and number of days during which racing may *Page 9 
be conducted by such licensee." Neb. Rev. Stat. § 2-1205 (2007). Parimutuel wagering on such "live" horse racing is authorized by Neb. Rev. Stat. § 2-1207 (2007).
In addition to licensing "live" races or race meetings at which parimutuel wagering is conducted, the Commission may license racetracks to conduct intrastate and interstate simulcast wagering on horse races. Neb. Rev. Stat. §§ 2-1223 to 2-1229 (2007). "[S]imulcast" is defined to "mean the telecast of live audio and visual signals of any horserace conducted in the state for the purpose of parimutuel wagering. . . ." Neb. Rev. Stat. § 2-1225(7) (2007). (emphasis added).[7] "Interstate simulcast" is defined to "mean parimutuel wagering at any licensed racetrack within the state on the results of any horserace conducted outside the state." Neb. Rev. Stat. § 2-1225(7) (2007).
Any licensed racetrack "which operates at least one live race meet during each calendar year. . ." may be "issued a[n] [intrastate] simulcast facility license" allowing the licensee to "display the simulcast of a horserace on which parimutuel wagering shall be allowed." Neb. Rev. Stat. § 2-1226 (2007) (emphasis added). Intrastate simulcast licensing requires execution of a written agreement between the sending and receiving tracks, which must be approved by the organization representing a majority of licensed owners and trainers at each track. Neb. Rev. Stat. § 2-1227(1) (2007). Simulcasts between racetracks in Nebraska "shall result in the combination of all wagers placed at the receiving track located in the state with the wagers placed at the sending track located in the state so as to produce common parimutuel betting pools for the calculation of odds and the determination of payouts from such pools. . . ." Neb. Rev. Stat. § 2-1227(4) (2007).
Licensed racetracks which conduct "live" racing for a certain number of days are eligible to receive interstate simulcast facility licenses. Neb. Rev. Stat. § 2-1228 (2007). "Any racetrack issued an interstate simulcast facility license may conduct the interstate simulcast of any horserace permitted under its license, and parimutuel wagering shall be allowed on such horserace." Id. An interstate simulcast facility license issued to a licensed racetrack in Nebraska allows the racetrack "to receive the interstate simulcast of horseraces for parimutuel wagering purposes from any track located outside of the state." Neb. Rev. Stat. §2-1229(1) (2007). Among the factors the Commission is to consider in acting on an interstate simulcast facility license is whether "such interstate simulcast would have a significant effect upon either live
racing or the simulcasting of *Page 10 live racing of the same type and at the same time conducted in this state. . . ." Id. (emphasis added).
Commission approval of an interstate simulcast facility license is conditioned upon: (1) Prior written approval of "any other racetrack issued a license . . . and conducting live racing of the same type on the same day at the same time as the proposed interstate simulcast race or races and of the organization which represented a majority of the licensed owners and trainers at the racetrack's immediately precedinglive thoroughbred race meeting;" (2) Prior written approval of "any other racetrack issued a license . . . which is simulcasting the racing program of any licensee conducting live racing in this state of the same type on the same day at the same time as the proposed interstate simulcast race or races and of the organization which represented a majority of the licensed owners and trainers at the racetrack's immediately precedinglive thoroughbred race meeting;" and (3) "[A] written agreement between the receiving track and the sending track located outside of the state . . . setting forth the division of all proceeds between the sending and receiving tracks and all other conditions under which such interstate simulcast will be conducted." Neb, Rev. Stat. § 2-1229(1)(a)-(c) (2007) (emphasis added). The agreement between the sending and receiving track "shall have the consent of the group representing the majority of horsepersons racing at the sending track and of the organization which represented a majority of the licensed owners and trainers at the receiving track's immediately preceding live thoroughbred race meeting."Id. at § 2-1229(1)(c) (emphasis added).
Neb. Rev. Stat. § 2-1216 (2007) provides: "The parimutuel system of wagering on the results of horseraces, when conducted within the racetrack enclosure at licensed horserace meetings . . ., shall not under any circumstances be held or construed to be unlawful, any other statutes of the State of Nebraska to the contrary notwithstanding." Parimutuel wagering on horse racing is authorized and governed by Neb. Rev. Stat. §2-1207 (2007), which provides, in pertinent part:
 (1) Within the enclosure of any racetrack where a race or race meeting licensed and conducted under sections 2-1201 to 2-1218 is held or at a racetrack licensed to simulcast races or conduct interstate simulcasting, the parimutuel method or system of wagering on the results of the respective races may be used and conducted by the licensee. . . . Under such system, the licensee may receive wagers of money from any person present at such race or racetrack receiving the simulcast race or conducting interstate simulcasting . . . by any person who may legally wager on any horse race in a race selected by such person to run first in such race, and the person so wagering shall acquire an interest in the total money so wagered on all horses in such race as first winners in proportion to the amount of money wagered by him or her. Such licensee shall issue to each person so wagering a certificate on which shall be shown the number of the race, *Page 11 
the amount wagered, and the number or name of the horse selected by such person as first winner. . . . [After taking out authorized or required deductions from amounts wagered]. . . . [t]he balance remaining on hand shall be paid out to the holders of certificates on the winning horse in the proportion that the amount wagered by each certificate holder bears to the total amount wagered on all horses in such race to run first. The licensee may likewise receive such wagers on horses selected to run second, third, or both, or in such combinations as the commission may authorize, the method, procedure, and authority and right of the licensee, as well as the deduction allowed to the licensee, to be specified with respect to wagers upon horses selected to run first. (emphasis added).
Subsection (3) of § 2-1207 further provides that "there shall be no wagering except under the parimutuel method outlined in this section."
A review of the Nebraska statutes authorizing parimutuel wagering on horse races noted above indicates the Legislature has approved only parimutuel wagering on: (1) "live" horse races conducted in Nebraska within the confines of a license racetrack; (2) "live" horse races simulcast "intrastate" from one racetrack in Nebraska to other licensed Nebraska racetracks; and (3) "live" horse races simulcast from racetracks outside Nebraska to licensed Nebraska racetracks. The statutory scheme authorizing parimutuel wagering on horse races does not permit wagering on replays of races previously run in Nebraska or elsewhere. Only wagering on live races conducted at licensed race meets in Nebraska, or wagering on live events simulcast from within or outside Nebraska, is permitted under Nebraska's current statutes governing parimutuel wagering on horse racing.[8]
The statutes authorizing parimutuel wagering on live horse races conducted at licensed race meets in Nebraska and simulcasts of live races from other licensed Nebraska racetracks or from racetracks outside Nebraska are consistent with the Constitution's authorization of such wagering "on the results of horse races, wherever run, either within or outside of the state, by the pari-mutuel method, when such wagering is conducted by licensees within a licensed racetrack enclosure." Neb. Const. art. III, § 24. Again, the history of this constitutional provision, including the 1988 amendment to authorize simulcasting, demonstrates an intent to allow the Legislature to authorize parimutuel wagering on horse races "wherever run," either in or outside *Page 12 
Nebraska. The voters approving the original authorization of parimutuel wagering in 1934, as well as those approving the 1988 simulcasting amendment, no doubt understood such wagering was to be made on live horse races. While the language of art. III, § 24(4) does not specifically foreclose wagering on replays of previously run or historic horse races employing electronic or video gambling devices, we conclude it is likely that wagering on "historic horseraces" through IRTs may not be authorized under art. III, § 24.[9]
3. Is wagering using an electronic historic horseracing terminal amethod of parimutuel wagering on horse races which may be permitted underNeb. Const. art. III, § 24?
As stated previously, art. III, § 24(4), likely cannot be construed to allow the Legislature to authorize wagering on "historic horseraces" through IRTs. Further, while the Instant Racing system is promoted as a parimutuel wagering system, there is a question as to whether the manner in which "Instant Racing" would be conducted is truly "parimutuel" wagering. It may be true that "Instant Racing" can be said to involve parimutuel wagering in a broad sense, since there is a pooling of wagers and a distribution of amounts wagered to winners. There appears, however, to be a distinction between parimutuel wagering on traditional live and simulcast races, and Instant Racing. Unlike most parimutuel wagering on live and simulcast races, where many wagers are made on a single race or series of races, Instant Racing involves wagers on many different races. The pools also do not pertain to specific races.[10]
It is not clear that wagering on historic horseraces through IRTs is truly "parimutuel" in nature. In view of our conclusion that, for the reasons noted above, such wagering *Page 13 
likely may not be authorized under art. III, § 24, it is not necessary to determine whether the particular manner in which such wagering is proposed to be conducted could be considered wagering "by the parimutuel method" as that term is used in art. III, § 24(4).[11]
4. Does LB 1102, as Introduced, Constitute an Improper Delegation ofLegislative Authority?
There may also be a question as to whether the lack of definition and standards in LB 1102's grant of authority to the Commission to authorize wagering on "historic horseraces" is an unconstitutional delegation of legislative authority. "It is a fundamental general principle that the Legislature may not delegate legislative power to an administrative or executive authority." Schumacher v. Johanns, 272 Neb. 346, 364,722 N.W.2d 37, 51 (2006). "The Legislature does, however, have power to authorize an administrative or executive department to make rules and regulations to carry out an expressed legislative purpose, or for the complete operation and enforcement of a law within designated limitations," Id. "The limitations of the power granted and the standards by which the granted powers are to be administered must, however, be clearly and definitely stated in the authorizing act." Id. "Such standards may not rest on indefinite, obscure, or vague generalities, or upon extrinsic evidence not readily available." Id. "Where the Legislature has provided reasonable limitations and standards for carrying out delegated duties, there is no unconstitutional delegation of legislative authority." Id.
LB 1102 seeks to allow the Commission to "[l]icense and regulate parimutuel wagering on historic horseraces." The bill as introduced contains no definition of "historic horseraces", and no indication that it is intended to authorize wagering on previously run races through the use of IRT devices resembling slot machines or other electronic gambling devices. Perhaps this intent can be inferred from the use of the term "historic horseraces", and the Introducer's Statement of Intent that the bill "would allow Nebraska licensed horse racing premises the ability to install and operate Instant Racing Terminals." Committee Statement on LB1102, 101st Leg., 2nd Sess., *Page 14 
Introducer's Statement of Intent 1 (February 10, 2010). The vagueness and lack of specificity in the bill itself, however, raises a question as to whether the bill as introduced involves an improper delegation of legislative authority without adequate standards.
We note that a recently filed Judiciary Committee amendment would add several provisions to the bill, including: (1) a definition of "historic horserace" as "a form of horserace that creates a parimutuel pool from wagers placed on a horserace previously held at a licensed racetrack"; (2) a requirement that the Commission shall not issue a license for wagering on historic horseraces unless the county board of the county in which the licensed facility is located has adopted a resolution approving such wagering; (3) authority for the Commission to adopt rules and regulations to implement wagering on historic horseraces; (4) directing the Commission to require that "enough of the historic horserace [ ] be televised so as to maintain the integrity of such horserace before another wager may take place or before beginning another historic horserace"; (5) establishing a license fee of $1000 for each machine used for wagering on historic horseraces to be credited to the Historic Horseracing Distribution Fund ["Fund"]; (6) imposition of a tax on gross sums wagered on historic horseraces to be credited to the Fund; and (7) a mechanism for distribution of proceeds from the Fund. AM2234, §§ 2-4 (March 16, 2010). The Committee amendment appears to eliminate the absence of definition and standards present in the bill as initially introduced, and likely would eliminate any improper delegation of legislative authority present in the introduced bill.
5. Will the Enactment of LB 1102 Allow Native American Tribes to Engagein Gaming Utilizing IRTs on Tribal Lands?
Senator Fulton has requested us to address whether the enactment of LB 1102 will allow Native American tribes to engage in additional gaming on tribal lands involving wagering on historic horseraces through IRTs. Senator Fulton also asks whether, if passage of the bill allows tribes to engage in such gaming, the state would have the authority to regulate those devices operated on tribal lands.
The Indian Gaming Regulatory Act ["IGRA"] was enacted in 1988 for the purpose of providing a statutory basis for the operation and regulation of gaming by Indian tribes. 25 U.S.C. §§ 2701 to 2721. IGRA classifies gaming into three categories, each subject to a different regulatory scheme: (1) "Class i gaming", which includes "social games solely for prizes of minimal value or traditional forms of Indian gaming engaged in by individuals as a part of. . .tribal ceremonies or celebration"; (2) "Class II gaming", which *Page 15 
generally includes bingo, pull-tabs, lotto, tip jars, and other games similar to bingo, non-banking card games "explicitly authorized by the laws of the State" or "not explicitly prohibited by the laws of the State" played at any location in the state, when played in conformity with any state laws and regulations, and banking card games operated on or before May 1, 1988; and (3) "Class III gaming", which means "all forms of gaming that are not class I gaming or class II gaming."25 U.S.C. § 2703(6)-(8). Class I gaming is "within the exclusive jurisdiction of the Indian tribes." 25 U.S.C. § 2710(a)(1). Class II gaming is subject to tribal regulation with oversight by the National Indian Gaming Commission. 25 U.S.C. § 2710(d)(3)(A) and (B). Class III gaming is "lawful on Indian lands only if such activities are" authorized by a tribal ordinance or resolution, "located in a State that permits such gaming for any purpose by any person, organization or entity," and is "conducted in conformance with a Tribal-State compact entered into by the Indian Tribe and the State. . . ." 25 U.S.C. § 2710(d)(1)(A) to (C).[12]
The use of IRTs to wager on historic horseraces, not being within the definitions of Class I or Class II gaming in IGRA, would constitute a form of Class III gaming. Under IGRA, a state must negotiate for the conduct of the specific forms of Class III gaming activity the state affirmatively "permits" or authorizes others to conduct under state law.See Cheyenne River Sioux Tribe v. State of South Dakota, 3 F.3d 273, 279
(8th Cir. 1993) ("The `such gaming' language in 25 U.S.C. § 2710(d)(1)(B) does not require the state to negotiate with respect to forms of gaming that it does not presently permit."). If LB 1102 becomes law and wagering on historic horseraces through IRTs is approved under the legislation, the state, absent a judicial determination that such gaming is unconstitutional, would be obligated to negotiate a compact with any Native American Tribe seeking to conduct this form of Class III gaming on Indian lands located within the state. See Neb. Rev. Stat. § 9-1, 106(1) (2007) (Requiring Governor or his or *Page 16 
her designated representative to negotiate a tribal-state compact for Class III gaming with any Indian tribe having jurisdiction over Indian lands in Nebraska).[13] With respect to the state's authority to regulate IRTs located on Indian lands, any state regulatory role would be a matter subject to negotiation as part of the compact process.
C. Conclusion.
In summary, we conclude that LB 1102's attempt to authorize wagering on the results of previously run horse races through the use of IRTs resembling slot machines or other video gambling devices likely does not constitute a form of parimutuel wagering which the Legislature may permit under Neb. Const. art. III, § 24(4). The use of IRT's to wager on the results of previously run horse races appears to be impermissible, as the history of this constitutional provision indicates it was intended to allow wagering on live horse races held within a Nebraska licensed racetrack enclosure or simulcast from racetracks inside or outside Nebraska to a Nebraska licensed racetrack. In view of our determination that wagering on historic horseraces using IRTs likely may not be authorized under art. III, § 24(4), it is not necessary to determine whether the pooled wagering involved in the use of IRTs is a form of "parimutuel" wagering as that term is used in the Constitution. The vagueness and lack of specificity in the introduced bill, which contains no definition of "historic horseraces" and no indication on its face that it is intended to authorize wagering on previously run races through the use of IRTs, raises a question as to whether the bill as originally drafted involves an improper delegation of legislative authority without adequate standards. The pending Judiciary Committee amendment, however, appears to eliminate any improper delegation of legislative authority present in the bill as introduced. Finally, If LB 1102 becomes law and wagering on historic horseraces through IRTs is approved under the legislation, then the state, absent a judicial determination that such gaming is unconstitutional, *Page 17 
would be obligated to negotiate a compact with any Native American tribe seeking to conduct this form of Class III gaming on Indian lands located within the state. Any state authority to regulate IRTs operated on Indian lands would be a matter subject to negotiation as part of the compact process.
Very truly yours,
JON BRUNING Attorney General
L. Jay Bartel Assistant Attorney General
Approved:
___________________________ Attorney General
[1] A pending Judiciary Committee amendment would add several provisions to the introduced bill, including a definition of "historic horserace", as well as establishment of licensing fees and taxes on gross sums wagered on historical horse races. AM2234 (filed March 16, 2010).
[2] The discussion of "Instant Racing" contained herein is based on information from the web site of Amtote International (www.amtote.com), the Wyoming Supreme Court's description of the system in Wyoming DownsRodeo Events, LLC v. State, 134 P.3d 1223 (Wyo. 2006), and promotional materials issued by RaceTech, LLC.
[3] Not all current live or simulcast bets involve wagering on a single race. For example, in Pick Six wagering, a bettor must correctly select the first place finisher in six consecutive races to win the jackpot. If no bettor has a winning ticket, a portion of the pot is paid out to those coming closest to the winning combination, with the remainder carried forward to subsequent racing days until a Pick Six winner occurs.
[4] The Attorney General had opined that the intrastate simulcasting proposed under LB 708 was permissible under art. III, § 24, but that such opinion should not be construed to sanction legislative authority to permit interstate simulcast wagering. Op. Att'y Gen. No. 87041 (March 27, 1987). While there was some disagreement as to whether even intrastate simulcasting was permissible, there was apparently no dispute that a constitutional amendment was needed to allow interstate simulcast wagering. Committee Records on LR15CA at 37, 42-44, 49-50.
[5] The original proposed amendment included language authorizing off-track wagering at certain licensed sites. The committee amendments removed this language. Committee Records on LR 15CA, Executive Session Record of Committee Amendments at 1.
[6] The Constitution also requires that the parimutuel wagering be "conducted by licensees within a licensed racetrack enclosure. . . ." Neb. Const. art. Ill, § 24(4). The requirement that wagering be conducted within the confines of a licensed racetrack has led the Nebraska Supreme Court to declare unconstitutional legislative attempts to sanction betting on horse races from off-track "teleracing facilities" (State ex rel. Stenberg v. Douglas Racing Corp., 246 Neb. 901,524 N.W.2d 61 (1994)), as well as "telephonic wagering" (State ex rel.Stenberg v. Omaha Exposition and Racing, Inc., 263 Neb. 991, 644 N.W.2d 563
(2002)). This requirement does not appear to be at issue, however, as there is no indication that LB 1102 seeks to allow IRTs at any location other than within the confines of a licensed racetrack.
[7] The definition of "simulcast" as the telecast of a live horse race is consistent with the commonly understood meaning of this term, which, in this context, refers to "a closed-circuit television broadcast of an event, as a horse race, while it is taking place." "simulcast." Dictionary.com Unabridged. Random House, Inc., http://dictionary.reference.com/browse/simulcast (accessed March 18, 2010).
[8] The Oregon Court of Appeals recently held that the Oregon Racing Commission lacked authority to approve wagering on previously run horse races through IRTs because the Oregon Commission's statutory authority to approve mutuel wagering was limited to authorizing wagering on only live races. MEC Oregon Racing, Inc. v. Oregon Racing Comm'n, 233 Ore. App. 9,___ P.3d ___ (2009).
[9] Two Alabama Attorney General Opinions have concluded that Instant Racing is permissible because parimutuel wagering on the outcome of horse or dog races involves skill and thus is not an illegal lottery. 192 Op.Att'y Gen. Ala. 42 (December 5, 2008); Op. Att'y Gen. Ala. No. 2001-114 (March 13, 2001). The Nebraska Supreme Court, however, has held that parimutuel wagering on horse races is a form of "gambling" or "lottery" or "game of chance". State ex rel. Ak-Sar-Ben Exposition Co., 118 Neb. 851,226 N.W. 705 (1929), permanent injunction entered State ex rel. Sorensonv. Ak-Sar-Ben Exposition Co., 121 Neb. 248, 236 N.W. 736 (1931). Because of this decision, the Nebraska Constitution was amended in 1934 to authorize parimutuel wagering on horse races. Further, the Alabama Attorney General opinions assumed, without discussion, that Instant Racing involved parimutuel wagering.
[10] As noted in footnote 3, supra, not all wagering on live or simulcast horse races involves only a single race, including wagers such as Pick Six combinations.
[11] With regard to the "parimutuel" nature of Instant Racing, the Maryland Attorney General concluded that wagering on video replays of "historic horse races" through IRTs was not permissible because it did not constitute parimutuel betting as authorized under the Maryland Horse Racing Act. 20 Op. Att'y Gen. Md. 244 (March 17, 2009). In addition, the Kentucky Attorney General recently determined that instant Racing was not permissible under Kentucky's parimutuel wagering statute because it did not constitute parimutuel wagering as defined by Kentucky's Administrative Regulations. Op. Att'y Gen. Ky. 10-001 (January 5, 2010).
[12] "Indian lands" is defined in IGRA to include "all lands within the limits of any Indian reservation. . ." and lands held in trust by the United States for the benefit of any Indian tribe over which an Indian tribe exercises governmental power. 25 U.S.C. § 2703(4)(A) and (B). While IGRA generally provides that gaming shall not be conducted on Indian lands acquired by the Secretary of the Interior ["Secretary"] in trust for the benefit of an Indian tribe after October 17, 1988, there are several exceptions, including: (1) lands that are within or contiguous to the boundaries of an Indian tribe's reservation; (2) new trust lands where the Secretary has determined the gaming would not be detrimental to the surrounding community, if the Governor of the State where the gaming is conducted concurs in the Secretary's determination; and (3) lands taken in trust as part of settlement of a land claim or the restoration of lands for an Indian tribe that is restored to federal recognition. 25 U.S.C. § 2719(a) and (b)(1)(A)-(B).
[13] If such negotiations did not result in execution of a compact, the tribe could bring suit in federal district court to challenge the state's failure "to negotiate in good faith." 25 U.S.C. § 2710(d)(7)(A)(i) and2710(d)(B)(i). If the federal district court found the state failed to negotiate in good faith, then the IGRA remedial process would be triggered to obtain a compact. 25 U.S.C. § 2710(d)(7)(B)(iii). If the state asserts the defense of sovereign immunity to the federal district court suit, the tribe could then petition the Secretary to adopt procedures for Class III gaming. 25 C.F.R. Part 291.